UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- x
JOHNNY HINCAPIE,

Plaintiff,

-against-

CITY OF NEW YORK; Detective CARLOS GONZALEZ;
Detective DONALD CASEY; Detective JAMES CHRISTIE;
Detective  MICHAEL  CLARK;  Detective  ARTHUR
SWENSON; Police Officer MARK COUSINS; Sergeant
GARY BORMAN; Detective JOSE ROMAN ROSARIO;
Detective DANIEL RIZZO; Sergeant GLENN D'OTTAVIO;
Detective ROBERT NARDI; Sergeant SHARIF ALI; Detective
MATTHEW SANTORO; Detective DANIEL CURTAIN;
Detective THOMAS MARINO; Sergeant JACK HERBST;
Sergeant TIMOTHY CONNOLLY; Detective ALLEN F.
GARCIA; Sergeant WILFRED MELENDEZ; Police Officer
JEFF MOORER; Detective GREEN; Deputy Chief JOSEPH
DEMARTINO; Detective BOB MURPHY; and JOHN and
JANE DOE 1 through 20,

Defendants.

-------------------------------------------------------------------------- x

**COMPLAINT**

Jury Trial Demanded

18 CV 3432

Plaintiff Johnny Hincapie, by and through his attorneys, the law firm of Harvis & Fett LLP, alleges as follows:

<u>INTRODUCTION</u>

1.      Plaintiff Johnny Hincapie spent the majority of his life, over 25 years, incarcerated as an alleged participant in the felony murder of "Utah Tourist" Brian Watkins in 1990, one of the most infamous crimes of New York City's darkest era.

2.      Mr. Hincapie, however, had no involvement in the crime.

3.     This injustice resulted from a series of intentional acts by the individual defendants, outlined herein, with participation and knowing approval of supervisors up the chain of command, and as a direct consequence of unconstitutional policies, practices and customs maintained by defendant City of New York.

## NATURE OF THE ACTION

4.     This is an action to recover money damages arising out of the violation of plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

5.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and the laws of the State of New York.

6.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## NOTICE OF CLAIM

8.     Within ninety days after the claim alleged in this complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

9.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

10.    This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

## JURY DEMAND

11.    Plaintiff demands a trial by jury in this action.

## PARTIES

12.    Plaintiff Johnny Hincapie is a resident of Queens County in the City and State of New York.

13.    Defendant City of New York is a municipal corporation organized under the laws of the State of New York. It operates the NYPD and operated the former, separate Transit Police Department ("Transit PD"), both of which are departments or agencies of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

14.    The individual defendants at all times relevant herein, were officers, employees and agents of the NYPD and/or Transit PD. The individual defendants are sued in their individual and official capacities.

15.    At all times relevant defendants John and Jane Doe 1 through 20 were police officers, detectives or supervisors employed by the NYPD and/or Transit PD. Plaintiff does not know the real names and shield numbers of defendants John and Jane Doe 1 through 20.

-3-

16.     At all times relevant herein, defendants John and Jane Doe 1 through 20 were acting as agents, servants and employees of the City of New York and the NYPD and/or Transit PD. Defendants John and Jane Doe 1 through 20 are sued in their individual and official capacities.

17.     At all times relevant herein, all individual defendants were acting under color of state law.

### JOHNNY HINCAPIE

18.     When Johnny Hincapie was underperforming academically at age 14, his school referred his family to a psychologist, Dr. Mary Maxwell, who conducted a battery of diagnostic tests.

19.     The tests were conclusive: Hincapie had a verbal IQ of 88 (at the "impaired" level), was "extremely anxious concerning his answers" and "eager to please," requiring "constant feedback."

20.     The examination also revealed "perceptual problems" and deficits in analysis and synthesis, which Dr. Maxwell associated with plaintiff's academic difficulties. The tests were generally consistent with high levels of suggestibility.

21.     Dr. Maxwell's findings were reinforced by the report of Dr. Stephen Honor, a forensic psychologist retained by the Hincapie family in 1991, who examined plaintiff on Rikers Island.

22.    Dr. Honor noted that plaintiff had "no history of behavioral problems," but had "particular difficulty in language-related areas (e.g. reading, oral communication and comprehension)."

23.    Mr. Hincapie, who is now 45 years old, had just turned 18 at the time of his arrest in September of 1990.

24.    Prior to his arrest on murder charges in the high-profile Watkins case, Mr. Hincapie had no police contacts.

25.    Raised to be respectful in a devout household by law-abiding and hardworking parents, Mr. Hincapie had a trusting view of the police, and believed they would act in his best interest.

## IN THE SHADOW OF THE JOGGER CASE

26.    Fall 1990 was a dark time in New York City.

27.    Murders were at their peak – 2,245 would take place that year – with scores taking place on the Subway.

28.    In August and December 1990, Yusef Salaam, Antron McCray, Raymond Santana, Kevin Richardson and Korey Wise – the Central Park Five – were wrongly convicted in the brutal rape of a jogger, only to be exonerated many years later.

29.    It would come to light that the five young men in the Jogger case were forced to falsely confess by NYPD detectives.

30.    The lead detective in the Jogger case and one of the men principally responsible for the coerced confessions in that case was defendant Carlos Gonzalez. *See* Sullivan Ronald, N.Y. Times, Oct. 24, 1989, *Detective Tells of Confession in Jogger Rape* (accessible at https://nyti.ms/2DeVh4Y).

31.    Defendant Gonzalez was also the lead detective investigating the murder of Brian Watkins.

32.    As he had done in the Jogger case, and using the same tactics, Gonzalez and the other defendants closed the Watkins investigation in less than 24 hours.

## HEADING TO ROSELAND

33.    On the evening of September 2, 1990, a large group of teens took the Subway from Queens to midtown Manhattan, heading to Roseland Ballroom for a DJ's birthday party.

34.    Johnny Hincapie was among that group.

35.    Johnny's friend Anthony Nichols was holding Johnny's money for him, because Johnny's pants did not have pockets.

## THE CRIME

36.     As the group of young people was arriving at the 53rd Street and 7th Avenue Subway Station, the Watkins family, tourists from Utah, were heading out for dinner in Greenwich Village.

37.     A small part of the larger group of teenagers going to Roseland stayed behind and, spotting the Watkins family on the Subway platform, targeted them for a mugging. Two of the teens were armed with knives.

38.     One of the muggers fatally stabbed 22-year-old Brian Watkins in the chest.

39.     Brian's father, Sherman Watkins, was attacked and his wallet, containing $200, was cut from his pocket, leaving him dazed and bleeding.

40.     Karen Watkins, Brian's mother, was assaulted and kicked.

41.     Todd Watkins, Brian's brother, and Michele, Todd's wife, were unharmed.

42.     In a twist over which the media would later obsess, the perpetrators spent the proceeds on tickets to Roseland and danced there until closing.

43.     Mr. Hincapie had no involvement in the crime and had no idea it was taking place.

44.    Plaintiff and another young man, Luis Montero, were upstairs on the Subway station's turnstile level with two girls while the crime was taking place, innocently unaware of what was going on hundreds of feet away on the platform below.

## ROUNDING UP THE WOLFPACK

45.    So high-profile was this killing, and such was its threat to the City's tourism industry, that the Mayor and District Attorney faced unusual pressures to deliver immediate results.

46.    The Watkins case landed on the desk of defendant Gonzalez as yet another "wolfpack" crime to be solved quickly at any cost.

47.    Since it had taken place on the Subway, Transit PD also assigned a lead detective, defendant Donald Casey.

48.    Following the crime, defendants Gonzalez and Casey, with the help of other defendants, used unconstitutional tactics to declare "case closed" within twenty-four hours, leaving two innocent men, including Mr. Hincapie, facing unjust murder charges.

49.    The first suspects taken into custody were Anthony Anderson and Luis Montero, who were arrested at Roseland after being identified by an eyewitness.

50.    Montero and Anderson were later identified in a show-up conducted with the Watkins family.

51.     At the Midtown North precinct, Montero was beaten but refused to falsely confess.

52.     Anthony Anderson admitted to involvement in the crime, providing written and videotaped confessions naming accomplices, but made no mention of Johnny Hincapie.[1]

53.     Within hours of the crime, the next two suspects, Ricardo Nova and Pascual Carpenter, were taken into custody – each was denied *Miranda* protections and unlawfully interrogated, leading to their confessions.

54.     By midday on September 3rd, three more suspects had been brought in and forced to confess, Emiliano Fernandez, Yull "Gary" Morales and Ricardo Lopez.

55.     Detectives forced the young men to not only confess, but to identify every person that was going to Roseland that night, and a number of additional names were mentioned, including Anthony Nichols, Kevin Mouton and Johnny Hincapie.

56.     However, in his confession on September 3rd, Ricardo Lopez explicitly stated, on videotape, that plaintiff had no involvement in the crime:

> A:     When we got out we…went upstairs. Then a – that whole bunch of people like (Indicating.) there was 60 of us, and 50 of them left (Indicating.) and the ones that need money stood there, but the two of them left.
> Q:     Okay.
> A:     And that's like it was eight of us.

---

[1] Anderson and Montero are among those who have provided sworn affidavits and testimony attesting to plaintiff's innocence, and detailing their own treatment by police.

Q:    Who was there then?
A:    It was Rocstar [Morales], Emiliano, Score [Carpenter], Anthony, a – who else? A – what's his name Ricardo, me, Johnny, and Kevin.
Q:    Okay. And they all needed money?
A:    (Shakes negatively.) <u>No, Johnny and Kevin left</u>.
Q:    Okay.
A:    <u>They left</u>.
Q:    So all the others needed money. Right?
A:    (Nods Affirmatively.) All of them. <u>All six of us</u>.
      …

Q:    So there were eight people surrounding the five [Watkins family members]?
A:    <u>No. No. Six</u>. (Indicating.)
Q:    There were six?
A:    <u>Because the two of them left</u>.

57.    But the detectives were not interested in the truth, their goal was to round up and implicate as many of the young suspects as possible, close the case, and obtain the professional accolades that were sure to follow.

58.    At around 8:00 p.m., having used a ruse to obtain the address of the Hincapie home, detectives left Midtown North to go out and arrest Johnny Hincapie in Queens.

59.    Plaintiff was the last suspect arrested and, by the time he was taken into custody, detectives had a fully-formed theory of the case that wrongly and corruptly included Johnny Hincapie as a perpetrator.

-10-

## PLAINTIFF IS COERCED TO "CONFESS" AT MIDTOWN NORTH

60.     One could hardly conjure a more stressful environment than the tinderbox that was the Midtown North Precinct in the hours following the Watkins killing.

61.     Top brass from the NYPD and Transit PD converged on the precinct in a battle for control over the latest sensational "wolfpack" case, jockeying to be the first to announce that the case had been closed.

62.     But as lead Transit PD Detective Donald Casey explained at pre-trial hearings, it was Detective Carlos Gonzalez of the NYPD who was running the show:

> Defense Attorney:    So, you kind of stood by the side and let [Detective] Gonzalez do –
>
> Detective Casey:      It was his house. I'm a guest in the house. I play by his rules.

63.     The rules Gonzalez played by are now well known from the Jogger case's exhaustive record, and include abusive, illegal interrogation tactics and manufactured confessions from young, powerless suspects.

64.     James Cospito, a now deceased Transit detective who was allegedly in the room for plaintiff's confession but was never produced as a witness by the State, "did not see eye to eye" with Detective Casey, and was rumored to have complained that Casey was abusing suspects during the Watkins investigation.

65.    At plaintiff's NYCPL § 440.10 hearing, Luis Montero described the scene

inside Midtown North after Montero himself initially refused to confess:

> They took me out of the stairway then they brought
> me to this locker room.…[T]hey sit me [at a
> bench]…[T]hen they start asking me questions. At the
> beginning they were very nice, they were asking me,
> oh, you know you should help us out with this, you
> should tell us what happened, you know, so you could
> go home faster. So I told them, I already told you the
> truth what I know, you know. So they said, no, that is
> not true, they [say] you hit a lady. I said I didn't hit
> nobody. [A]fter they…did not hear what they wanted
> to hear, they started to hit me. They had this little
> [weapon]…And they just hit me around the kidneys
> and just slapped me every time I tell them something
> they did not want to hear. They just hit me. So that is
> when the nightmare started.

66.    Pascual Carpenter, another of plaintiff's eventual co-defendants, also

recalls a "very intimidating and threatening" environment inside the Midtown North

interrogation rooms on September 3rd.

67.    According to Mr. Carpenter, Gonzalez and Casey forcefully coerced him

into adopting the detectives' narrative in his written and videotaped statements over his

objection, and instructing Mr. Carpenter to falsely identify plaintiff as a participant,

noting that "*Miranda* was not part of the picture."

68.    Keith Aldridge, an initial suspect in the case who was also interrogated

inside Midtown North, reported being punched and kicked by detectives.

69.     Ricardo Nova also accused the detectives of coercing his statement.

70.     Notably, Emiliano Fernandez, the only suspect officers claim ever implicated Mr. Hincapie in the crime, also accused detectives of coercing his statements, and mentions plaintiff only after the fact.

71.     Under illegal custodial interrogation over several hours, plaintiff repeatedly denied involvement in the crime and told the truth, but Detective Casey, who had been awake for forty-plus hours and was desperate to close the case and impress his bosses, insisted plaintiff was lying and became violent.

72.     Casey, taking care to ensure the account would satisfy felony murder's elements, and that minimal evidence of the physical abuse would remain, forced Mr. Hincapie to falsely confess to vague, bystander-like participation in the crime, and knowledge of its planning, with the false promise that Mr. Hincapie would then be taken straight home.

73.     Johnny Hincapie – barely eighteen years old and with deficient language comprehension skills, believed the detective's false promises, feared for his life and lacked any meaningful grasp of the nature or gravity of the circumstances he confronted.

74.     He rehearsed the story and signed a confession written by detectives, who also showed him a picture of Karen Watkins and told him she was the woman he should say he pushed.

75.    Defendant Christie wrote out the confession and Mr. Hincapie was directed to sign it.

76.    The role in the crime to which detectives forced Mr. Hincapie to falsely confess was the very role that Pascual Carpenter, an African-American young man, had confessed to hours earlier and a role that only Carpenter, given his race, could have played.

77.    A short time later, seated in a room with the detectives' gaze fixed on him, the detectives had Mr. Hincapie repeat the false story to ADA Donna Henken during a 23-minute recorded session.

78.    Mr. Hincapie is seen on video in a trance-like state, watching the detectives as he provides internally-inconsistent and confused, largely one-word affirmative answers to a series of leading questions posed by ADA Henken, drawn from the false written statement.

79.    When asked to describe his own involvement on camera, Hincapie reverts to the third person, using the pronouns "they" and "them" in place of "I" or "we." His phrasing suggests that he was not actually present, let alone involved.

80.    On the limited occasions a narrative question is posed to him, Mr. Hincapie is unable to articulate the detailed confession prepared for him; but his bungled delivery is kept on-script by a prosecutor eager for clean confessions.

81.     The video contains graphic evidence of the violence Mr. Hincapie had endured moments earlier at the hands of Detective Casey, including patches of hair missing from his right temple.

82.     The Hincapie video statement also presents scientific markers of false confession, including plaintiff's dispositional vulnerability (including age) and situational risk factors: i.e. the officers' presence, the framing of the shot and atmosphere in the room, the style of the questioning, plaintiff's speech patterns, and the use of non-public information and black-box interrogation techniques.

83.     As the detectives well knew, not a shred of physical evidence ever tied Mr. Hincapie to the crime – not a fingerprint, a follicle or a drop of blood.

84.     The detectives knew, from Mr. Hincapie's own statements and the statements of Ricardo Lopez and others, Mr. Hincapie was completely innocent, but they forced him to confess and caused him to be convicted nonetheless.

## THE IDENTIFICATION PROCEDURES AND TRIAL

85.     No one ever positively identified Mr. Hincapie as taking part in the Watkins robbery or murder, either before or at trial.

86.     In addition to failing to identify Mr. Hincapie as a participant in the crime, the six eyewitnesses offered by the State at trial cumulatively made 27 misidentifications during line-up procedures.

87.    The only evidence presented at trial against Mr. Hincapie was the false confession coerced by Detective Casey and a single witness's equivocal, cross-racial pre-trial statement that Mr. Hincapie looked "vaguely familiar."

88.    The trial court excluded credible exculpatory statements made by plaintiff's co-defendant Ricardo Lopez on legally dubious hearsay grounds, declined to allow any testimony or discovery regarding allegations that police had abused suspects and decided all matters of substance in favor of the State.

89.    When attorneys for plaintiff and his co-defendants sought a continuance to investigate allegations of police abuse at the end of the trial, in order to substantiate claims of abuse raised in the case, the following exchange ensued:

| The Court: | …We're going to have the charge conference now so let's get rid of the jury. |
| --- | --- |
| Mr Hanna: | For the record, Your Honor, on behalf of Mr. Fernandez, we are asking for an adjournment to be able to investigate these new allegations. |
| | In the information that we have, and I've spoken to Mr. Touger's investigator, is that Detective Cospito evidently was an eyewitness to this assault. Of all the [p]eople Mr. Schiels has spoken to, for some reason he has not spoken to the one person who is alleged to be the eyewitness in the case. |
| | Therefore, we need time to investigate this and we would ask for an adjournment of a few days, at least until Monday, to make investigation. |
| The Court: | Denied, denied. |

Mr. Kahan:          I join in that application.

Mr. Richman:        I join in that application.

Mr. Farbman:        Yes.

The Court:          All right, denied.

90.    James Cospito died on November 10, 2011.

91.    All defense motions were denied, including motions for, *inter alia*, mistrial and recusal, following across-the-board guilty verdicts and maximum sentences. *See*, Sullivan, Ronald, N.Y. TIMES, January 4, 1992, *4 Are Given Maximum Sentences in Utah Tourist's Subway Murder* (accessible at https://nyti.ms/2vqzMQf) ("Jabbing his finger at the defendants in a crowded but hushed courtroom, Justice Torres described the defendants as unremorseful 'predatory beasts' who attacked as a 'wolfpack' and who 'killed to go dancing.'")

92.    Deference to the trial court's factual findings led to the denial of all appeals.

## THE MISCARRIAGE OF JUSTICE COMES TO LIGHT

93.    Multiple witnesses with direct knowledge testified under oath to Mr. Hincapie's actual innocence before the court at the 440 hearing, none of whom had testified at plaintiff's criminal trial.

94.    In its decision overturning the conviction, the hearing court broadly credited the exculpatory testimony.

95.     The hearing court concluded that plaintiff had "demonstrably recanted" the false confession "from the moment he met his first attorney."

96.     One particular eyewitness, Mariluz Santana, testified that she observed the entirety of the Watkins robbery from an unobstructed nearby vantage while waiting for a friend on the Subway platform.

97.     Although she knew in 1990 that plaintiff was innocent after seeing his face in news reports, Ms. Santana testified that she took her mother's advice to "stay out of it," with the expectation that the truth would invariably come to light.

98.     Unaware that plaintiff then spent the ensuing decades in jail, Ms. Santana learned of the 440 hearing from news accounts in 2015 and reluctantly came forward to testify.

99.     With absolute certainty, Ms. Santana swore that Mr. Hincapie had no role in the commission of the crime.

100.    Mr. Hincapie was incarcerated for 25 years, 1 month and 3 days, or 9,164 days.

101.    During that time, Mr. Hincapie – who had no police contacts prior to his arrest in this case – was by all accounts a model inmate, working at various jobs, improving himself through education (achieving, *e.g.*, a Master's Degree), and serving as a role model to his fellow prisoners.

## THE SCIENCE OF FALSE CONFESSIONS

"Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process. Triers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained. No other class of evidence is so profoundly prejudicial. Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof."

*Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (Brennan, J., dissenting) (citations and quotation marks omitted).

102.  New York State has an above-average rate of false confessions.

103.  In exonerations based on DNA evidence in New York State, of which there have been approximately thirty, false confessions appear in nearly 50% of cases.

104.  The best scientific estimate of the nationwide false confession rate is in the range of 20-25%, with a much higher rate in murder cases.

105.  The leading academic researcher is Professor Saul M. Kassin, of the John Jay College of Criminal Justice and Williams College, who, in 1985, with Lawrence S. Wrightsman, established a framework of three types of false confessions: voluntary, compliant and internalized, that has gained widespread acceptance.

106.  According to Professor Kassin, a compliant false confession is where "the suspect acquiesces in order to escape from a stressful situation, avoid punishment, or gain a promised or implied reward." Such false confessions are common even in the absence of physical violence, which guarantees them.

107.   The quintessential compliant false confession case is that of the Central Park Five, youths who in 1989 were convinced by detectives <u>including Carlos Gonzalez</u> that they would be brought straight home if they falsely admitted to peripheral involvement in a jogger's brutal rape. The teens were instead convicted and sentenced, only to be exonerated years later through DNA evidence.

108.   Even when conducted legally, American-style police interrogation is a psychologically oriented, guilt-presumptive process in which lying is permitted and suspects are intentionally isolated and confronted.

109.   The literature describes police interrogation as an inherently asymmetrical social interaction "led by an authority figure who holds a strong *a priori* belief about the target and who measures success by the ability to extract an admission from that target."

110.   Researchers have identified "situational risk factors," that increase the likelihood of false confession, including the presentation of false evidence and the use of misinformation.

111.   In replicable peer-reviewed experiments, innocent individuals presented with false evidence are found nearly twice as likely to give a false written confession, doing so at a rate of 94%.

112.   A suspect's profile may also increase their "dispositional vulnerability," or the likelihood that they will succumb to even legal interrogation tactics.

113.    Youth is considered by far the primary risk factor for false confession, with 90% of juveniles waiving *Miranda*, even where it is offered.

114.    The presence of "interested adults," as some states require, has been shown to do little to curb false confessions, as guardians often urge cooperation with interrogators, as was seen in the Jogger case.

115.    Kassin explains:

> As to what makes juveniles so vulnerable, developmental research indicates that adolescents display an immaturity of judgment in their decision making—a pattern of behavior that is characterized by impulsivity, a focus on immediate gratification, and a diminished capacity for perceptions of future risk. For the myopic adolescent, confession may serve as an expedient way out of a stressful situation. To make matters worse, most justice-involved youth have diagnosable psychological disorders, putting them at double jeopardy in the interrogation room.

116.    Aside from age, researchers have identified being prone to compliance in social settings and suggestibility as generally associated with dispositional vulnerability.

117.    People who are easily coerced score high on the Gudjonsson suggestibility scale, a diagnostic test developed by Icelandic psychologist Gisli Hannes Gudjonsson that involves reading the subject a short story and testing their recall.

118.    Those who are "highly anxious, fearful, depressed, delusional, or otherwise psychologically disordered" are also more likely to falsely confess under pressure.

119.    Another identified cause of false confessions is the inability of police interrogators to accurately recognize when someone is lying. Studies show that law enforcement officers have little to no increased ability to detect false statements.

120.    Kassin tells the story of Jeffrey Deskovic, who spent 15 years in prison after he falsely confessed to a murder before being exonerated by DNA evidence. In relenting to pressure and offering a false confession, Deskovic believed that "truth and justice would prevail" and that his innocence would be discovered: "I thought it was all going to be okay in the end."

## DEFENDANTS' MALICE AND DELIBERATE INDIFFERENCE

121.    As described above, defendants manufactured evidence, coerced a confession from plaintiff and concealed the misconduct that pervaded the investigation.

122.    Defendants' malice is confirmed by their behavior toward the other suspects, including, in particular, Luis Montero, who was jailed for eighteen months before being exonerated.

123.    The witness whose testimony exculpated Mr. Montero was never adequately disclosed to plaintiff, although it would have tended to exonerate him. This was a *Brady* violation.

124.    Similarly, defendants including Gonzalez worked to shape the testimony of Anthony Nichols to deprive plaintiff of a viable defense theory.

125.   Defendants coached and coerced Emiliano Fernandez and Ricardo Nova to falsely implicate plaintiff in the crime, even though neither of their statements place him at the scene.

126.   Defendants knew or should have known that they did not have probable cause to arrest and prosecute plaintiff for felony murder because they deliberately used constitutionally impermissible practices to manufacture evidence against him that they knew to be false. There was no physical, circumstantial or testimonial evidence linking plaintiff to the crime. Nevertheless, on September 3, 1990, defendants caused plaintiff to be charged with the death of Brian Watkins.

127.   Defendants procured an indictment against plaintiff in bad faith and conspired to charge him with felony murder, also in bad faith.

128.   Plaintiff is innocent and has maintained his innocence from the inception of the criminal prosecution against him.

129.   Unfortunately, plaintiff's wrongful conviction was not an isolated incident. By 1990, the NYPD was well aware that arrests and prosecutions tainted by police falsifications were a major problem—one that had been the subject of numerous lawsuits, civil settlements, and excoriating judicial opinions.

130.   The Central Park Jogger case illustrates the dangerous and unconstitutional practices in use at the time. The fact that defendant Gonzalez was

involved in both cases as the lead detective strongly supports the conclusion that the same unconstitutional tactics were used in both cases.

131.   Further, beginning with the Knapp Commission in the 1970's, the City was on notice of pervasive corruption within the NYPD and the existence of widespread evidence fabrication.

132.   By the early 1990's, a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Report") had noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." The Mollen Report referred to police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful."

133.   This widespread disregard for the truth caused the wrongful conviction of plaintiff and countless others.

## THE CITY'S UNCONSTITUTIONAL POLICIES

134.   The unconstitutional and tortious acts of the defendant officers were not isolated incidents. Upon information and belief, there was a custom, policy, pattern and practice of the City beginning years before the unjust conviction of Mr. Hincapie and continuing throughout his incarceration, of condoning, encouraging, ratifying and acquiescing in the practice of failing to conduct reasonable criminal investigations, conducting unconstitutional interrogations, fabricating evidence including confessions and evidence supporting probable cause, committing perjury, failing to investigate alibi evidence, coercing confessions, failing to disclose exculpatory evidence and covering up this unconstitutional misconduct. Upon information and belief, City policymakers were on notice of, but deliberately indifferent to these unconstitutional customs, policies and practices.

135.   Upon information and belief, the City, and its policymakers, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in eliciting confessions, disclosing favorable evidence to prosecutors, and obtaining probable cause for arrest and for prosecution, and that they did not fabricate evidence or commit perjury.

136.   Upon information and belief, the City, through its final policymakers, failed to adequately screen, supervise, and/or discipline detectives, officers, and investigators.

137.   As a direct and proximate consequence of the aforementioned actions by the defendants, plaintiff suffered over twenty-five years of imprisonment. During his incarceration, he sustained a variety of physical and emotional injuries.

## PLAINTIFF'S INJURIES AND DAMAGES

138.   Mr. Hincapie suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit. He was denied effective treatment for his emotional injuries while incarcerated and continues to suffer mental anguish to this day. For example, plaintiff fears police contact and his everyday activities are limited and disrupted by the traumas he has suffered in this case. He was imprisoned when his grandmother—with whom he had an extremely close relationship before he was incarcerated—passed away. He was not allowed to attend his grandmother's funeral.

139.   Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends. While he was incarcerated, he was denied the opportunity to spend quality time with his extremely

close-knit family and to develop full relationships with his brother's children, let alone have children himself.

140.   Plaintiff was denied decades of gainful employment and income. His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

141.   Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated, in the most extreme manner possible. He was a unique figure of national outrage and disdain, for events in which he had no part. Nothing can undo the reputational damage he has sustained.

142.   Plaintiff and his family incurred substantial legal fees during the decades he spent seeking to defend himself and prove his innocence.

143.   Additionally, Mr. Hincapie claims, *inter alia*, loss of liberty; loss of enjoyment of life; continuing pain and suffering, including post-incarceration psychological issues; post-incarceration mental health treatment costs; lost earnings while incarcerated; impaired earning capacity and limitations on future employment opportunities; emotional distress; humiliation; indignities; embarrassment; degradation; physical injuries and lack of access to health care while incarcerated; attorneys' fees, and other pecuniary losses; and past pain and suffering.

## FIRST CLAIM
### Federal Malicious Prosecution

144.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

145.   Defendants, including Casey, Gonzalez, Christie, Ali and others, acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. Hincapie, without probable cause or other legal justification, by fabricating or coercing a confession they falsely attributed to Mr. Hincapie and failing to disclose their misconduct, and in reckless disregard of favorable evidence disproving Mr. Hincapie's guilt.

146.   There was not even arguable probable cause to arrest or prosecute Mr. Hincapie on the basis of the confession falsely attributed to him, and no reasonable officer would have believed there was.

147.   The prosecution ultimately terminated in Mr. Hincapie's favor when his conviction was vacated and the indictment against him was dismissed.

148.   As a direct and proximate result of individual defendants' misconduct, Mr. Hincapie was wrongfully convicted and suffered the injuries and damages described above.

## SECOND CLAIM
### Fabrication of Evidence in Violation of 4th and 14th Amendments

149.   Defendants Casey, Gonzalez, Christie and others deliberately fabricated evidence by manufacturing a statement and forcing Mr. Hincapie to adopt it in written and oral form and then misrepresenting to prosecutors, in conjunction with their own perjurious testimony, that the statements had originated with Mr. Hincapie.

150.   Mr. Hincapie was then wrongly convicted based solely on the so-called confession.

151.   Defendants also altered the confessions of several of plaintiff's co-defendants to falsely implicate him, albeit tangentially, in the crime.

152.   Defendants failed to adequately disclose exculpatory witness information, in violation of their obligations under *Brady*, including regarding Tannisha Vasquez (also know as "Ms. V."), and otherwise suppressed favorable evidence.

153.   Additionally, defendants coached and tampered with the testimony of Anthony Nichols, to corruptly deprive Mr. Hincapie of exculpatory information possessed by that witness.

154.   Such fabrication of evidence violated Mr. Hincapie's clearly established Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law.

155.   As a direct and proximate result of the individual defendants' fabrications, Mr. Hincapie was wrongfully convicted and suffered the injuries and damages described above.

### THIRD CLAIM
### § 1983 Coercion

156.   Defendants Casey, Gonzalez, Christie and others isolated Johnny Hincapie – who had just turned eighteen and found himself in his first police encounter – engaged in, *inter alia*, a deliberate course of lies, trickery and deceit, threatening and inflicting bodily harm on plaintiff, giving him false assurances of leniency, false legal advice and promises that Mr. Hincapie would not be charged and would be taken home once he assented.

157.   Then, despite his protestations of innocence, in a custodial interrogation in which *Miranda* warnings and counsel were withheld, plaintiff's will was ultimately overborn, and defendants induced Mr. Hincapie to sign the statement defendants had prepared, unwittingly and falsely incriminating himself

in violation of his clearly established Fifth and Sixth Amendment right to be free from compelled self-incrimination and to be afforded access to counsel.

158. Defendants' coercive and conscience-shocking interrogation tactics generated false and unreliable evidence used against Mr. Hincapie at trial, causing his wrongful conviction and all the injuries set forth above.

FOURTH CLAIM
§ 1983 Supervisory Liability

159. Supervisors, including, *inter alia*, Sergeant Ali, Sergeant Borman, Deputy Chief DeMartino, Sergeant Connolly, Sergeant Herbst, Captain Bayshim and unidentified individuals, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the NYPD or Transit PD, with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of the detectives and police officers who deprived Mr. Hincapie of his clearly established constitutional rights.

160. The supervisors were personally involved in both the deprivation of Mr. Hincapie's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

161.    The supervisors were reckless in their failure to supervise defendants the subordinate defendants, and either knew or should have known that defendant officers were maliciously prosecuting civilians, deliberately failing to investigate evidence pointing to other leads or suspects, fabricating and coercing confessions, suppressing exculpatory evidence, perjuring themselves as witnesses, and depriving civilians of due process of law.

162.    These supervisory defendants knew or in the exercise of due diligence would have known that the conduct of the named and John Doe defendants against Mr. Hincapie was likely to occur.

163.    The failure of these supervisory defendants to train, supervise and discipline the named individual defendants and John Does amounted to gross negligence, deliberate indifference or intentional misconduct, which directly caused the injuries and damages set forth above.

### FIFTH CLAIM
#### *Monell* Custom and Policy and Failure to Supervise or Train

164.    The City of New York, by and through its final policymakers, had in force and effect during the Watkins investigation and for years beforehand, a policy, practice or custom of conducting constitutionally inadequate investigations; fabricating inculpatory evidence; perjury; failing to obtain probable cause to ensure

that suspects would not be falsely arrested and maliciously prosecuted; suppressing from prosecutors material information favorable to criminal defendants; failing to follow the duties imposed by *Brady v. Maryland;* and using unconstitutional interrogation techniques.

165.   The City of New York systemically failed adequately to train its police officers, detectives and investigators to conduct constitutionally adequate investigations; not to lie about their conduct; to accurately document the manner in which interrogations were conducted when confessions were elicited; to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; to disclose to prosecutors material information favorable to criminal defendants; and to refrain from unconstitutional interrogation techniques and perjury.

166.   The City of New York failed to adequately supervise its police officers, detectives and investigators in conducting constitutionally adequate investigations; accurately documenting the manner in which interrogations were conducted when confessions were elicited so that confessions were not fabricated; obtaining probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclosing to prosecutors material information favorable to criminal

defendants; testifying truthfully; and refraining from using unconstitutional interrogation techniques. Officers knew that in this climate of lax supervision, they were free to deviate from constitutional requirements in these areas.

167.   The City of New York, by and through its final policymakers, failed to adequately discipline their police officers for investigative wrongdoing, though it was foreseeable that constitutional violations of the type Mr. Hincapie suffered would be a predictable result of such failures.

168.   As set forth above, final policymakers for the City of New York had actual or constructive notice of such failures to train, supervise and discipline its employees, and failed to provide training or supervision despite an obvious need for such training and supervision, where defendants knew that it was foreseeable that detectives, officers, and investigators would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

169.   Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Hincapie, and were the moving force behind his false, coerced and fabricated

confession, causing his arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.

## SIXTH CLAIM
### State Law Malicious Prosecution

170.   Defendants Casey, Gonzalez, Christie, and John Doe police officers and supervisors, lacking probable cause, nonetheless intentionally, recklessly, and with malice, caused Mr. Hincapie to be arrested, prosecuted, and convicted of felony murder.

171.   Defendants' actions initiated and commenced the prosecution, and defendants took steps to ensure that it continued.

172.   Furthermore, the defendant officers intentionally withheld from and misrepresented to prosecutors facts vitiating probable cause against Mr. Hincapie, including but not limited to the substance of Tannisha Vasquez's statement, and the information they learned from the suspects during the initial unconstitutional interrogations, as well as subsequent information learned from Anthony Nichols and others.

173.   As Mr. Hincapie has maintained from the outset, he is innocent of any wrongdoing and had no knowledge of or participation in the crime.

174.   The prosecution finally terminated in Mr. Hincapie's favor when his conviction was vacated and the charges against him dismissed.

175.   As a direct and proximate result of defendants' actions, Mr. Hincapie was wrongly prosecuted, convicted and imprisoned for over twenty-five years, and suffered other grievous and continuing damages and injuries set forth above.

## SEVENTH CLAIM
### State Law False Imprisonment

176.   Defendants intended to confine Mr. Hincapie, and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps to ensure he was imprisoned on the basis of false evidence and without legal justification.

177.   Mr. Hincapie was conscious of the confinement, and did not consent to it.

178.   As a direct and proximate result of defendants' actions, Mr. Hincapie was wrongly arrested and falsely imprisoned from September 3, 1990, until he was finally released on October 6, 2015, and suffered the other grievous and continuing damages and injuries set forth above.

## EIGHTH CLAIM
### Intentional or Negligent Infliction of Emotional Distress

179.   The deliberate conduct of the defendants in coercing and fabricating a false confession from a vulnerable and scared teenage boy for a murder they knew he did not commit, their ensuing refusal to investigate the matter properly, and their

cover-up of the truth, perpetuated in public statements over many years, constitutes the intentional infliction of emotional distress.

180.   In the alternative, defendants' conduct in coercing and fabricating a false confession and covering up the truth breached a duty of care owed to Mr. Hincapie as a citizen and as a criminal suspect, which unreasonably endangered his physical safety and caused him to fear for his own safety, constituting the negligent infliction of emotional distress.

181.   Defendants' conduct, falsely implicating Mr. Hincapie in the infamous Watkins murder and subjecting him to public stigma to this day notwithstanding the dismissal of charges against him, caused Mr. Hincapie to suffer ongoing, unimaginable emotional distress and traumatic psychological *sequelae*.

## NINTH CLAIM
### Failure to Intervene

182.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

183.   Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to

prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

184.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated:       April 19, 2018
             New York, New York

                        HARVIS & FETT LLP

                        _____
                        Gabriel P. Harvis
                        Baree N. Fett
                        305 Broadway, 14th Floor
                        New York, New York 10007
                        (212) 323-6880
                        gharvis@civilrights.nyc

                        *Attorneys for plaintiff*

-38-