## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHNNY HINCAPIE,<br><br>       Plaintiff,<br><br>    v.<br><br>CITY OF NEW YORK; Detective CARLOS GONZALEZ; Detective DONALD CASEY; Detective JAMES CHRISTIE; Detective ARTHUR SWENSON; Detective JOSE RAMON ROSARIO; Detective DANIEL RIZZO; Detective MATTHEW SANTORO; Sergeant SHARIF ALI; Sergeant JOHN HERBST; Sergeant TIMOTHY CONNOLLY; Sergeant GARY BORMAN; The Estate of Deputy Chief JOSEPH DEMARTINO; Lieutenant VICTOR MOLE; Captain "JOHN" BAYSHIM; JOHN and JANE DOE DETECTIVES 1-5; and JOHN and JANE DOE SUPERVISORS 1-5,<br><br>       Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Jury Trial Demanded<br><br>18 CV 3432 (PAC) (RWL) |

Plaintiff Johnny Hincapie, by and through his attorneys, the law firm of Elefterakis, Elefterakis & Panek, alleges as follows:

## <u>INTRODUCTION</u>

1. Plaintiff Johnny Hincapie spent the majority of his life, over 25 years, incarcerated as an alleged participant in the felony murder of "Utah Tourist" Brian Watkins in 1990, one of the most infamous crimes of New York City's darkest era.

2. Mr. Hincapie, however, had no involvement in the crime.

3.     This injustice resulted from a series of intentional acts by the individual defendants, outlined herein, with participation and knowing approval of supervisors up the chain of command, and as a direct consequence of policies, practices and customs maintained by defendant City of New York.

## NATURE OF THE ACTION

4.     This is an action to recover money damages arising out of the violation of plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

5.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and the laws of the State of New York.

6.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## NOTICE OF CLAIM

8.     Within ninety days after the claim alleged in this complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

9.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

10.    This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

## JURY DEMAND

11.    Plaintiff demands a trial by jury in this action.

## PARTIES

12.    Plaintiff Johnny Hincapie is a resident of Queens County in the City and State of New York.

13.    Defendant City of New York is a municipal corporation organized under the laws of the State of New York. It operates the NYPD and operated the former, separate Transit Police Department ("Transit PD"), both of which are departments or agencies of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

14.    The individual defendants at all times relevant herein, were officers, employees and agents of the NYPD and/or Transit PD. The individual defendants are sued in their individual capacities.

15.    At all times relevant defendants Detectives John and Jane Doe 1 through 10 were police officers, detectives or supervisors employed by the NYPD and/or Transit PD. Plaintiff does not know the real names and shield numbers of defendants Detectives John and Jane Doe 1 through 10.

16.     At all times relevant herein, defendants Detectives John and Jane Doe 1 through 10 were acting as agents, servants and employees of the City of New York and the NYPD and/or Transit PD. Defendants Detectives John and Jane Doe 1 through 10 are sued in their individual capacities.

17.     At all times relevant defendants Supervisors John and Jane Doe 1 through 10 were police officers, detectives or supervisors employed by the NYPD and/or Transit PD. Plaintiff does not know the real names and shield numbers of defendants Supervisors John and Jane Doe 1 through 10.

18.     At all times relevant herein, defendants Supervisors John and Jane Doe 1 through 10 were acting as agents, servants and employees of the City of New York and the NYPD and/or Transit PD. Defendants Supervisors John and Jane Doe 1 through 10 are sued in their individual capacities.

19.     At all times relevant herein, all individual defendants were acting under color of state law.

## JOHNNY HINCAPIE

20.     When Johnny Hincapie was underperforming academically at age 14, his school referred his family to a psychologist, Dr. Mary Maxwell, who conducted a battery of diagnostic tests.

21.    The tests were conclusive: Hincapie had a verbal IQ of 88 (at the "impaired" level), was "extremely anxious concerning his answers" and "eager to please," requiring "constant feedback."

22.    The examination also revealed "perceptual problems" and deficits in analysis and synthesis, which Dr. Maxwell associated with plaintiff's academic difficulties. The tests were generally consistent with high levels of suggestibility.

23.    Dr. Maxwell's findings were reinforced by the report of Dr. Stephen Honor, a forensic psychologist retained by the Hincapie family in 1991, who examined plaintiff on Rikers Island.

24.    Dr. Honor noted that plaintiff had "no history of behavioral problems," but had "particular difficulty in language-related areas (e.g. reading, oral communication and comprehension)."

25.    Mr. Hincapie, who will soon turn 47 years old, had just turned 18 at the time of his arrest in September of 1990.

26.    Prior to his arrest on murder charges in the high-profile Watkins case, Mr. Hincapie had no police contacts.

27.    Raised to be respectful in a devout household by law-abiding and hardworking parents, Mr. Hincapie had a trusting view of the police, and believed they would act in his best interest.

## IN THE SHADOW OF THE JOGGER CASE

28.     Fall 1990 was a dark time in New York City.

29.     Murders were at their peak – 2,245 would take place that year – with scores taking place on the Subway.

30.     In August and December 1990, Yusef Salaam, Antron McCray, Raymond Santana, Kevin Richardson and Korey Wise – the Central Park Five – were wrongly convicted of a jogger's brutal rape, only to be exonerated many years later.

31.     It would come to light that the five young men in the Jogger case were forced to falsely confess by NYPD detectives. *See* Kassin, Saul, N.Y. TIMES, Nov. 1, 2002, *False Confessions and the Jogger Case* (accessible at https://nyti.ms/2nEFMjc).

32.     Among the detectives responsible for interrogating the Central Park Five were Carlos Gonzalez and Jose Ramon Rosario. *See* Sullivan, Ronald, N.Y. TIMES, Oct. 24, 1989, *Detective Tells of Confession in Jogger Rape* (accessible at https://nyti.ms/2DeVh4Y) ("Detective Gonzalez's testimony came during a pretrial hearing on whether the statement by Mr. McCray, as well as statements by the other defendants, could be used as evidence. Lawyers for the defendants have argued in State Supreme Court in Manhattan that the statements in which some of the teen-agers incriminated each other were coerced by the police."); Sullivan, Ronald, N.Y. TIMES,

July 10, 1990, *Defense in Jogger Trial Argues Rights Violation* (accessible at: https://nyti.ms/2GYzdj2):

> "Did you ever raise your voice with him?" the assistant district attorney, Elizabeth Lederer, later asked [Detective Rosario]. "No," he replied. "Did you make any promises?" "No." "Any threats?" "Absolutely not." Justice Thomas B. Galligan has ruled that the defendant's statements were not coerced and has admitted them as evidence.

33.     Seventeen months after the Jogger case, defendants Gonzalez and Rosario reunited to interrogate suspects in the Brian Watkins murder investigation.

34.     As they had done in the Jogger case, and using the same tactics, Gonzalez, Rosario and the other defendants closed the Watkins investigation in a matter of hours.

## HEADING TO ROSELAND

35.     On the evening of September 2, 1990, a large group of teens took the Subway from Queens to midtown Manhattan, heading to Roseland Ballroom for a DJ's birthday party.

36.     Johnny Hincapie was among that group.

37.     Johnny's friend Anthony Nichols was holding Johnny's money for him because Johnny's pants did not have pockets.

## THE CRIME

38.     As the group of young people was arriving at the 53rd Street and 7th Avenue Subway Station, the Watkins family, tourists from Utah, were heading out for dinner in Greenwich Village.

39.     A small part of the larger group of teenagers going to Roseland stayed behind and, spotting the Watkins family on the Subway platform, targeted them for a mugging. Two of the teens were armed with knives.

40.     One of the muggers fatally stabbed 22-year-old Brian Watkins in the chest.

41.     Brian's father, Sherman Watkins, was attacked and his wallet, containing $200, was cut from his pocket, leaving him dazed and bleeding.

42.     Karen Watkins, Brian's mother, was assaulted and kicked.

43.     Todd Watkins, Brian's brother, and Michele, Todd's wife, were unharmed.

44.     In a twist over which the media would later obsess, the perpetrators spent the proceeds on tickets to Roseland and danced there until closing.

45.     Initial reports describe five perpetrators.

46.     Mr. Hincapie had no involvement in the crime and had no idea it was taking place.

47.    Plaintiff and another young man, Luis Montero, were upstairs on the Subway station's turnstile level with two girls while the crime was taking place, innocently unaware of what was going on hundreds of feet away on the platform below.

## ROUNDING UP THE WOLFPACK

48.    So high-profile was this killing, and such was its threat to the City's tourism industry, that the Mayor and District Attorney faced unusual pressures to deliver immediate results.

49.    The Watkins case landed on the desks of defendants Gonzalez and Rosario as yet another "wolfpack" crime to be solved quickly at any cost.

50.    Since it had taken place on the Subway, Transit PD also assigned a lead detective, defendant Donald Casey.

51.    Following the crime, defendants Gonzalez, Rosario and Casey, with the help of the other defendants, used unconstitutional tactics to declare "case closed" within twenty-four hours, leaving Mr. Hincapie and another innocent man facing unjust murder charges.

52.    The first suspects taken into custody were Anthony Anderson and Luis Montero, who were arrested at Roseland after being identified by an eyewitness.

53.    According to police, Montero and Anderson were identified in a show-up conducted with the Watkins family.

54.     At the Midtown North Precinct, Anthony Anderson admitted to involvement in the crime, providing written and videotaped confessions naming accomplices, but made no mention of Johnny Hincapie.[1]

55.     Defendants Gonzalez and Casey interrogated Anthony Anderson. The interrogation was not recorded.

56.     Over the course of several hours and four separate interrogation sessions – one of which took place in the precinct's locker room – Luis Montero was beaten but refused to falsely confess.

57.     Defendants Gonzalez and Casey were among the officers who interrogated Montero. The four interrogations of Luis Montero were not recorded.

58.     At a pre-trial hearing, Detective Casey described the scene inside Midtown North at that point: "Detective Gonzalez and I, we had to go out and inform the bosses what was going on. At this point it was politics, a lot of politics involved between two departments head banging between bosses."

59.     Within hours of the crime, the next two suspects, Ricardo Nova and Pascual Carpenter, were taken into custody – each was denied *Miranda* protections and unlawfully interrogated, leading to the production of statements that, for the first time, include the name "Johnny" as a member of the group traveling from Queens.

---

[1] Anderson and Montero are among those who have provided sworn affidavits and testimony attesting to plaintiff's innocence and detailing their own mistreatment by police.

60.     Defendants Casey and Gonzalez interrogated Pascual Carpenter. The interrogation was not recorded.

61.     At pre-trial hearings, the officers testified that Carpenter was *Mirandized* before he was questioned.

62.     But in his videotaped statement to Assistant District Attorney Donna Henken on September 3, 1990, Carpenter described the events differently:

> Q:     And before making that statement to Detective Casey, were you advised of your rights to remain silent, just as you were now?
> A:     <u>After--after I wrote it.</u>
> Q:     Okay. Umm, and –
>        DETECTIVE CASEY: (INAUDIBLE) signed the form after the statement was taken. That's what did happen. You signed the form after the statement was taken, correct?
> A:     Yes. …
> Q:     But prior to giving that statement, were you given you[r] rights at that time, right? The detective advised of your rights prior to your giving the statement?
> A:     <u>No.</u> He gave--<u>he gave me my rights after and I had to sign the paper</u>.

63.     At no point in his videotaped statement did Pascual Carpenter ever mention Johnny Hincapie.

64.     Indeed, Carpenter repeatedly indicated to Assistant District Attorney Donna Henken that the information in his written statement (which includes the name "Johnny") had been supplied by defendants Casey and Gonzalez:

> Q:     Did you see-- a box cutter?
> A:     I heard that somebody had a box cutter, but didn't see it.
> Q:     When did you hear that someone had a box cutter?

A:     The--<u>the officer told me</u>.

Q:     The officer told you? You didn't see him with it?

A:     No. …

Q:     And were you present when the plan was made to rob these people?

A:     No.

Q:     Okay. Do you remember saying in an earlier statement, we had decided to take these people's money?

A:     Me saying that?

Q:     Yes.

A:     That I said that?

Q:     Yes.

A:     No, I didn't say that. <u>I heard them say that</u>, but I didn't--I didn't say that to them.

Q:     Do you remember saying to the detective, Detective Casey, we had decided to take these people's money?

A:     No…

Q:     You said once we ripped off the people, that means you and the others, we went to Roseland. Did you make that statement before?

A:     That's what I wrote down, but I didn't--<u>I didn't say it to the officer</u>.

65.    Since his recent release from prison, Mr. Carpenter has described defendants Gonzalez and Casey as coercing him into adopting the detectives' narrative in his written statement and instructing him to list Johnny Hincapie as present, even though Carpenter had no such knowledge.

66.    Carpenter describes Casey and Gonzalez as "very intimidating and threatening," echoing his videotaped statement in his more recent remarks: "*Miranda* was not part of the picture until they got the statements they wanted."

67.    Like Carpenter, Ricardo Nova was fed names by investigators.

68.     Defendants Rosario and Borman, who initially interrogated Nova, admitted at trial that Nova was not *Mirandized* for the first several hours, at which point the defendants decided to "go official." The Nova interrogation was not recorded.

69.     The initial statement attributed to Ricardo Nova, labeled "8:30 a.m.," was written by Defendant Rosario.

70.     According to that statement, a list of eleven individuals perpetrated the robbery, six more than had been reported by the victims.

71.     That afternoon, Nova was made to prepare a second statement in his own hand by defendants including Swenson.

72.     In the second statement attributed to Nova, the surname of a suspect is corrected from "Perez" to "Lopez" and the list of perpetrators narrowed to eight, including plaintiff and Luis Montero.

73.     As described by Nova's attorney David Touger in an affirmation dated November 30, 1991:

> (a) Detective Casey is the detective in charge of this investigation for the New York City Transit Police.
> (b) He has held this title since he began the investigation of this matter on September 2, 1990.
> (c) Detective Casey assaulted one of the defendants in this matter in an effort to coerce a statement from that defendant.
> (d) This assault took place during the morning hours of September 3, 1990, at the Mid-Town North Police Precinct.

(e) This assault was witnessed by at least Detective Cospito of the New York City Transit Police.

(f) After the assault occurred New York City Transit Police, Internal Affairs Division responded to Mid-Town North Precinct.

(g) After conducting an investigation Internal Affairs submitted a report, including therein their findings of fact and recommendations of punishment. Furthermore, the New York City Police Department conducted its own investigation into this matter.

(h) The defense has never been given these reports.

(i) Nor was the defense allowed to question Detective Casey about why he and Detective Cospito do not get along anymore when Detective Casey mentioned this during the Huntley hearing held in this matter.

(j) It should be further noted by the Court that since Detective Casey made the arrests in this matter, his command has been changed at least three times.

(k) [Ricardo Nova] has alleged from the beginning that his statements were taken in violation of his constitutional rights and were coerced from him by the overly aggressive techniques of the Detectives involved in the investigation of this matter.

74.  By midday on September 3rd, three more suspects had been brought in: Emiliano Fernandez, Yull "Gary" Morales and Ricardo Lopez.

75.  Detectives forced the young men to not only confess to participation but inculpate a list of other individuals.

76.  Despite the officers' efforts, Yull "Gary" Morales made no mention of Johnny Hincapie.

-14-

77.     Defendants Rizzo, Santoro and Christie caused Emiliano Fernandez to go back after his statement had been drafted and add a caret with the name "Johnny."

78.     These interrogations were not recorded, but Fernandez, Morales and Lopez each gave videotaped statements to ADA Donna Henken.

79.     The officers' unconstitutional efforts to conform the evidence to their flawed theory is evident in the statements attributed to Ricardo Lopez.

80.     Lopez's written statement (purportedly prepared in the presence of defendant Swenson) makes no mention of Johnny Hincapie.

81.     However, the police report prepared by defendant Swenson and approved by defendant Connolly states that Lopez told investigators "7 others," including "Johnny" had allegedly "stayed behind" to participate in the crime.

82.     But Lopez's video statement proves he had not inculpated Johnny Hincapie and that the statements in the police report to the contrary were fabricated by the defendants:

> A:     When we got out we…went upstairs. Then a – that whole bunch of people like (Indicating.) there was 60 of us, and 50 of them left (Indicating.) and the ones that need money stood there, <u>but the two of them left</u>….
> Q:     Who was there then?
> A:     It was Rocstar [Morales], Emiliano, Score [Carpenter], Anthony, a – who else? A – what's his name Ricardo, me, Johnny, and Kevin.
> Q:     Okay. And they all needed money?
> A:     (Shakes negatively.) <u>No, Johnny and Kevin left</u>.
> Q:     Okay.

A:   <u>They left</u>.
Q:   So all the others needed money. Right?
A:   (Nods Affirmatively.) All of them. <u>All six of us</u>. …
Q:   So there were eight people surrounding the five [Watkins family members]?
A:   <u>No. No. Six</u>. (Indicating.)
Q:   There were six?
A:   <u>Because the two of them left.</u>

83.   Defendants were not interested in the truth; their goal was to shape the evidence to meet their version of the events, declare the case closed and obtain the professional accolades that were sure to follow.

84.   At around 8:00 p.m., having used a ruse to obtain the address of the Hincapie residence, defendants Ali and Christie, along with Detective James Cospito, left Midtown North to go out and arrest Johnny Hincapie in Queens.

85.   Mr. Hincapie was the last suspect arrested and, by the time he was taken into custody, detectives had a fully-formed theory of the case that wrongly and corruptly included Johnny Hincapie as a perpetrator.

## PLAINTIFF IS COERCED TO "CONFESS" AT MIDTOWN NORTH

86.   One could hardly conjure a more stressful environment than the tinderbox that was the Midtown North Precinct in the hours following the Watkins killing.

87.   Top brass from the NYPD and Transit PD converged on the precinct in a battle for control over the latest sensational "wolfpack" case, jockeying to be the first to announce that the case had been closed.

88.     But as lead Transit PD Detective Donald Casey explained at pre-trial hearings, it was lead NYPD Detective Carlos Gonzalez who was running the show:

> Defense Attorney:     So, you kind of stood by the side and let [Detective] Gonzalez do –
>
> Detective Casey:      It was his house. I'm a guest in the house. I play by his rules.

89.     The rules Gonzalez (and Rosario) played by are now well known from the Jogger case's exhaustive record, and include abusive, illegal interrogation tactics and manufactured confessions from young, powerless suspects.

90.     Detective James Cospito of Transit PD, who was allegedly in the room for plaintiff's confession but was never produced as a witness by the State, "did not see eye to eye" with Detective Casey (according to Casey himself), and was reported to have complained that Casey was abusing suspects during the Watkins investigation.

91.     At plaintiff's NYCPL § 440.10 hearing, Luis Montero described the scene inside Midtown North after Montero himself initially refused to confess:

> They took me out of the stairway then they brought me to this locker room.…[T]hey sit me [at a bench]…[T]hen they start asking me questions. At the beginning they were very nice, they were asking me, oh, you know you should help us out with this, you should tell us what happened, you know, so you could go home faster. So I told them, I already told you the truth what I know, you know. So they said, no, that is not true, they [say] you hit a lady. I said I didn't hit nobody. [A]fter they…did not hear what they wanted to hear, they started to hit me. They had this little

> [weapon]…And they just hit me around the kidneys and just slapped me every time I tell them something they did not want to hear. They just hit me. So that is when the nightmare started.

92.    Keith Aldridge, an initial suspect in the case who was also interrogated inside Midtown North by defendant Swenson, reported being punched and kicked by detectives. The interrogation was not recorded.

93.    Ricardo Nova and Emiliano Fernandez also accused detectives of coercing their statements.

94.    Under illegal custodial interrogation over several hours, plaintiff repeatedly denied involvement in the crime and told the truth, but Detective Casey, who had been awake for forty-plus hours and was desperate to close the case and impress his bosses, insisted plaintiff was lying and became violent.

95.    Casey, taking care to ensure the account would satisfy felony murder's elements, and that minimal evidence of the physical abuse would remain, along with defendants Christie, Gonzalez and Ali, forced Mr. Hincapie to falsely confess to vague, bystander-like participation in the crime, and knowledge of its planning, with the false promise that Mr. Hincapie would then be taken straight home.

96.    Johnny Hincapie – barely eighteen years old and with deficient language comprehension skills, believed the defendants' false promises, feared for his life and lacked any meaningful grasp of the nature or gravity of the circumstances he confronted.

97.    He rehearsed the story and signed a confession written by detectives, who also showed him a picture of Karen Watkins and told him she was the woman he should say he pushed.

98.    Defendant Christie wrote out a statement in the third-person and Mr. Hincapie was directed to sign it. The other suspects had been permitted to write out their own statements.

99.    The role in the crime defendants forced Mr. Hincapie to adopt – pushing Karen Watkins – was, according to reliable evidence, that of an African-American perpetrator and the same role purportedly claimed hours earlier by Pascual Carpenter.

100.   The interrogation was not recorded.

101.   A short time later, with the gaze of defendants Christie and Casey fixed on him, Mr. Hincapie was made to repeat the false story to ADA Donna Henken during a 23-minute recorded session.

102.   Mr. Hincapie is seen on video in a trance-like state, watching the detectives as he provides internally-inconsistent and confused, largely one-word affirmative answers to a series of leading questions posed by ADA Henken, drawn from the false written statement.

103. When asked to describe his own involvement on camera, Hincapie reverts to the third person, using the pronouns "they" and "them" in place of "I" or "we." His phrasing suggests that he was not actually present, let alone involved.

104. On the limited occasions a narrative question is posed to him, Mr. Hincapie is unable to articulate the detailed confession prepared for him; but his bungled delivery is kept on-script by a prosecutor eager for clean confessions.

105. The video depicts the violence Mr. Hincapie had endured moments earlier at the hands of Detective Casey, with patches of hair missing from his temple.

106. The Hincapie video statement also presents scientific markers of false confession, such as plaintiff's dispositional vulnerability (including suggestibility and age) and situational risk factors: e.g. the officers' presence, the framing of the shot and atmosphere in the room, the style of the questioning, plaintiff's speech patterns, and the use of non-public information and black-box interrogation techniques.

107. As the detectives well knew, not a shred of physical evidence ever tied Mr. Hincapie to the crime – not a fingerprint, a follicle or a drop of blood.

108. The defendants knew from Mr. Hincapie's own statements, the statements of Ricardo Lopez and other evidence that Mr. Hincapie was innocent, but they forced him to confess and caused him to be convicted nonetheless.

## THE IDENTIFICATION PROCEDURES AND TRIAL

109.   No one ever positively identified Mr. Hincapie as taking part in the Watkins robbery or murder, either before or at trial.

110.   In addition to failing to identify Mr. Hincapie as a participant in the crime, the six eyewitnesses offered by the State at trial cumulatively misidentified 27 fillers during line-up procedures.

111.   The only evidence presented at trial against Mr. Hincapie was the false confession and a single witness's equivocal, cross-racial pre-trial statement that Mr. Hincapie looked "vaguely familiar."

112.   The trial court excluded the credible exculpatory statements made by Ricardo Lopez on legally dubious hearsay grounds, declined to allow any testimony or discovery regarding allegations that police had abused suspects and decided all matters of substance in favor of the State.

113.   When attorneys for plaintiff and his co-defendants sought a continuance to investigate allegations of police abuse, the following exchange ensued:

The Court:  …We're going to have the charge conference now so let's get rid of the jury.

Mr Hanna:  For the record, Your Honor, on behalf of Mr. Fernandez, we are asking for an adjournment to be able to investigate these new allegations.

In the information that we have, and I've spoken to Mr. Touger's investigator, is that Detective Cospito evidently

> was an eyewitness to this assault. Of all the [p]eople [trial prosecutor Tom] Schiels has spoken to, for some reason he has not spoken to the one person who is alleged to be the eyewitness in the case.
>
> Therefore, we need time to investigate this and we would ask for an adjournment of a few days, at least until Monday, to make investigation.

The Court:          Denied, denied.

Mr. Kahan:          I join in that application.

Mr. Richman:        I join in that application.

Mr. Farbman:        Yes.

The Court:          All right, denied.

114.    James Cospito died on November 10, 2011.

115.    All defense motions were denied, including motions for, *inter alia*, mistrial and recusal, following across-the-board guilty verdicts and maximum sentences. *See*, Sullivan, Ronald, N.Y. TIMES, January 4, 1992, *4 Are Given Maximum Sentences in Utah Tourist's Subway Murder* (accessible at https://nyti.ms/2vqzMQf) ("Jabbing his finger at the defendants in a crowded but hushed courtroom, Justice Torres described the defendants as unremorseful 'predatory beasts' who attacked as a 'wolfpack' and who 'killed to go dancing.'"). Mr. Hincapie was sentenced to twenty-five years to life.

116.    Deference to the trial court's factual findings led to the denial of all appeals.

## THE MISCARRIAGE OF JUSTICE COMES TO LIGHT

117. Mr. Hincapie filed a C.P.L. § 440.10 motion in November 2013 asserting actual innocence and newly-discovered evidence.

118. Multiple witnesses with direct knowledge testified under oath to Mr. Hincapie's innocence before the court at the 440 hearing, none of whom had testified at plaintiff's criminal trial.

119. In its decision overturning the conviction, the hearing court broadly credited the exculpatory testimony.

120. The hearing court concluded that plaintiff had "demonstrably recanted" the false confession "from the moment he met his first attorney."

121. One particular eyewitness, Mariluz Santana – who knew Mr. Hincapie from the neighborhood but was older and not closely acquainted with him – testified that she observed the entirety of the Watkins robbery from an unobstructed nearby vantage while waiting for a friend on the Subway platform.

122. Although she knew in 1990 that plaintiff was innocent after seeing his face in news reports, Ms. Santana testified that she took her mother's advice to "stay out of it," with the expectation that the truth would invariably come to light.

123.    Unaware that plaintiff then spent the ensuing decades in jail, Ms. Santana

learned of the 440 hearing from news accounts in 2015 and reluctantly came forward

to testify.

124.    With absolute certainty, Ms. Santana swore that Mr. Hincapie had no role

in the commission of the crime, describing a conversation with her mother:

> [W]e were both watching the news at the same time, and I
> was telling her, I said ma <u>I was there</u>. And when I seen
> Johnny's face, I said, ma, <u>he wasn't even there, why would</u>
> <u>they arrest him</u>. So my mother said, mihija, don't get
> involved in that. Leave things as they are and let the cops
> take care of it. I said, ma, <u>he wasn't there</u>. She said,
> mihija…don't get involved if things don't pertain to you.
> You have two kids. Don't worry about that kid. Cops will
> take care of it.

125.    Mr. Hincapie was incarcerated for 25 years, 1 month and 3 days, or 9,164

days.

126.    During that time, Mr. Hincapie – who had no police contacts prior to his

arrest in this case – was by all accounts a model inmate, working at various jobs,

improving himself through education (achieving, *e.g.*, a Master's Degree), and serving

as a role model to his fellow prisoners.

127.    Plaintiff took solace in his education and service while incarcerated. He

participated in and later helped lead a non-profit called Rehabilitation through the Arts

while on the Honor Ward at Sing Sing Prison. Several letters from correction staff were

filed in support of his request for parole.

128.   In one of the letters, a Correction Sergeant describes Mr. Hincapie:

> Please allow me the privilege and opportunity to write about someone whom many believe, including myself, to be a wonderful man.

> Through my observations, I have noticed that in 11 years that Johnny Hincapie has been at Sing Sing Correctional Facility, he has been an exemplary model inmate. He has made the effort to take advantage of every program that Sing Sing has to offer and with that knowledge, he has provided his human services to others as well. He has taught, assisted, and promoted positive change countless times--all demonstrating to me an altruistic behavior that is uncommon amid the prison population. Most importantly, Mr. Hincapie has always been respectful toward authority. It could be the Superintendent, a correction officer, or a sergeant like me, he has always behaved well-mannered and respectful toward everyone. It is unlikely to like someone's presence when speaking in terms of an inmate, but this inmate is very well liked, wherever he goes, and to me, this says a lot about what kind of person Mr. Hincapie is.

## THE SCIENCE OF FALSE CONFESSIONS

"Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process. Triers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained. No other class of evidence is so profoundly prejudicial. Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof."

*Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (Brennan, J., dissenting) (citations and quotation marks omitted).

129.   New York State has an above-average rate of false confessions.

130.   In exonerations based on DNA evidence in New York State, of which there have been over thirty, false confessions appear in nearly 50% of cases.

131.   The best scientific estimate of the nationwide false confession rate is in the range of 20-25%, with a much higher rate in murder cases.

132.   The leading academic researcher is Professor Saul M. Kassin, of the John Jay College of Criminal Justice and Williams College, who, in 1985, with Lawrence S. Wrightsman, established a framework of three types of false confessions: voluntary, compliant and internalized, that has gained widespread acceptance.

133.   According to Professor Kassin, a compliant false confession is where "the suspect acquiesces in order to escape from a stressful situation, avoid punishment, or gain a promised or implied reward." Such false confessions are common even in the absence of physical violence, which guarantees them.

134.   The quintessential compliant false confession case is that of the Central Park Five, youths who in 1989 were convinced by detectives <u>including Carlos Gonzalez and Jose Ramon Rosario</u> that they would be brought straight home if they falsely admitted to peripheral involvement in a jogger's brutal rape. The teens were instead convicted and sentenced, only to be exonerated years later through DNA evidence.

135.   Even when conducted legally, American-style police interrogation is a psychologically oriented, guilt-presumptive process in which lying is permitted and suspects are intentionally isolated and confronted.

136.   The literature describes police interrogation as an inherently asymmetrical social interaction "led by an authority figure who holds a strong *a priori* belief about the target and who measures success by the ability to extract an admission from that target."

137.   Researchers have identified "situational risk factors," that increase the likelihood of false confession, including the presentation of false evidence and the use of misinformation.

138.   In replicable peer-reviewed experiments, innocent individuals presented with false evidence are found nearly twice as likely to give a false written confession, doing so at a rate of 94%.

139.   A suspect's profile may also increase their "dispositional vulnerability," or the likelihood that they will succumb to even legal interrogation tactics.

140.   Youth is considered by far the primary risk factor for false confession, with 90% of juveniles waiving *Miranda*, even where it is offered.

141.   The presence of "interested adults," as some states require, has been shown to do little to curb false confessions, as guardians often urge cooperation with interrogators, as was seen in the Jogger case.

142.   Kassin explains:

> As to what makes juveniles so vulnerable, developmental research indicates that adolescents display an immaturity of judgment in their decision making—a pattern of behavior that is characterized by impulsivity, a focus on immediate gratification, and a diminished capacity for perceptions of future risk. For the myopic adolescent, confession may serve as an expedient way out of a stressful situation. To make matters worse, most justice-involved youth have diagnosable psychological disorders, putting them at double jeopardy in the interrogation room.

143.   Aside from age, researchers have identified being prone to compliance in social settings and suggestibility as generally associated with dispositional vulnerability.

144.   People who are easily coerced score high on the Gudjonsson suggestibility scale, a diagnostic test developed by Icelandic psychologist Gisli Hannes Gudjonsson that involves reading the subject a short story and testing their recall.

145.   Those who are "highly anxious, fearful, depressed, delusional, or otherwise psychologically disordered" are also more likely to falsely confess under pressure.

146.   Kassin tells the story of Jeffrey Deskovic, who spent 15 years in prison after he falsely confessed to a murder before being exonerated by DNA evidence. In relenting to pressure and offering a false confession, Deskovic believed that "truth and justice would prevail" and that his innocence would be discovered: "I thought it was all going to be okay in the end."

## DEFENDANTS' MALICE AND DELIBERATE INDIFFERENCE

147.   As described above, defendants manufactured evidence, coerced a confession from plaintiff and concealed the misconduct that pervaded the investigation.

148.   Defendants' malice is confirmed by their behavior toward the other suspects, including, in particular, Luis Montero, who was beaten and jailed for eighteen months before being exonerated.

149.   Evidence surrounding the witness whose testimony exculpated Mr. Montero was never disclosed to plaintiff, although it would have tended to exonerate him. This was a *Brady* violation.

150.   The suppression of Ricardo Lopez's exculpatory statements during his interrogation also violated *Brady.*

151.   The police report attributing inculpatory statements to Ricardo Lopez constituted the fabrication of evidence in violation of plaintiff's Fourteenth Amendment rights.

152.   The defendants altered the statements of suspects and non-parties to meet their view of the evidence in violation of plaintiff's due process rights.

153.   Similarly, defendants including Gonzalez worked to alter the testimony of Anthony Nichols to deprive plaintiff of a viable defense theory.

154.   But Nichols's uncle, Robert Escalera, revealed the truth in a sworn statement dated March 4, 1996:

In September of 1990 I was present in a family meeting located at my sister's home. Present at this meeting was my sister, brother-in-law, my mother, Anthony, and the Hincapie family; i.e., Maria, her husband, and their youngest son.

At this meeting the Hincapie family stated that they came to us at their attorney's request. It was mentioned by them how Johnny explained giving his money to Anthony to hold for him and later leaving the train station with Anthony; information that only Anthony could confirm toward Johnny's innocence.

My sister then questioned Anthony and requested him to explain the truth in this matter. After listening to Anthony's story, he reaffirmed Johnny's innocence by holding his money along with what Johnny was claiming. The Hincapie family felt a sense of relief and asked my sister and brother in law if Anthony could provide this information to their attorney and judge.

When the Hincapie family left the house my sister acted nervously and mentioned the means to hire an attorney that would protect Anthony from any arrest. I assured her that Anthony would be in no harm and could only help. The next day, she hired an attorney that promised to speak with the Manhattan D.A.'s office to help Anthony out of harm's way.

I have expressed my sympathy to Johnny about Anthony confirming his innocence to me more than once, but how his mother has prevented him from doing so.

My visits with Johnny can be confirmed by checking the logbook visits at C-74 where I visited him several times revealing this information at Riker's Island during 1990 and 1991.[2]

---

[2] Indeed, plaintiff's records from Rikers Island confirm visits by Mr. Escalera.

155.   The issues surrounding the Nichols alibi were never explored at trial.

156.   Defendants coerced Emiliano Fernandez, Ricardo Nova and Pascual Carpenter to falsely implicate plaintiff in the crime.

157.   Defendants knew or should have known that they did not have probable cause to arrest or prosecute plaintiff for felony murder because they deliberately used constitutionally impermissible practices to manufacture evidence against him that they knew to be false. There was no physical, circumstantial or testimonial evidence linking plaintiff to the crime.

158.   Nevertheless, on September 3, 1990, defendants caused plaintiff to be charged in the death of Brian Watkins.

159.   Defendants procured an indictment against plaintiff in bad faith and conspired to charge him with felony murder, also in bad faith.

160.   Plaintiff is innocent and has maintained his innocence from the inception of the criminal prosecution against him.

161.   Unfortunately, plaintiff's wrongful conviction was not an isolated incident. By 1990, the NYPD was well aware that arrests and prosecutions tainted by police falsifications were a major problem—one that had been the subject of numerous lawsuits, civil settlements, and excoriating judicial opinions.

162. The Central Park Jogger case illustrates the dangerous and unconstitutional practices in use at the time. The fact that defendants Gonzalez and Rosario were involved in both cases as lead detectives strongly supports the conclusion that the same unconstitutional tactics were used in both cases.

163. Further, beginning with the Knapp Commission in the 1970's, the City was on notice of pervasive corruption within the NYPD, the existence of widespread evidence fabrication and the need for recorded interrogations.

164. By the early 1990's, a report by the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Report") had noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets."

165. The Mollen Report referred to police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful."

166. This widespread disregard for the truth caused the wrongful conviction of plaintiff and countless others.

## THE CITY'S UNCONSTITUTIONAL INTERROGATION POLICY

167.   In September 1990, the City of New York, as a matter of policy and practice, did not record custodial interrogations.

168.   This policy led directly to plaintiff's wrongful conviction and allowed the defendants to conceal unconstitutional interrogation tactics and coercion.

169.   Had the coercive interrogation of plaintiff been recorded, the sub-rosa wrongful conduct of the defendants would have been revealed, along with plaintiff's innocence.

170.   The need for recorded interrogations is now well acknowledged.

171.   As The New York Times Editorial Board has explained: "If the police are confident they have their man, then why not be transparent on questioning? In the 21st century, the failure to record an entire interrogation — particularly in a high-profile murder case — is inexcusable." Editorial, N.Y. TIMES, *The Importance of Taping Confessions*, Sept. 18, 2014 (accessible at: https://nyti.ms/1o7hDYt).

172.   In 2018, New York State passed Bill A03964, which requires "the audio and video recording of every custodial interrogation at a place of detention."

173.   In enacting the bill, New York joined Colorado, Connecticut, Illinois, Kansas, Maine, Maryland, Michigan, Missouri, Montana, Nebraska, New Mexico,

North Carolina, Ohio, Oregon, Texas, Vermont, Wisconsin, and the District of Columbia in passing legislation regarding the recording of custodial interrogations.

174.    Four additional states – more than 2/3 of the populations of Arizona, Hawaii, Rhode Island and Utah – are covered by law enforcement agencies that record interrogations as a matter of policy.

175.    State supreme courts have taken action on the issue in Alaska, Indiana, Iowa, Massachusetts, Minnesota, New Hampshire, and New Jersey.

176.    Over 1,000 jurisdictions nationwide have voluntarily implemented recording policies.

177.    "Recording interrogations can be critical in helping convict the guilty, free the wrongly accused and uphold faith and confidence in our criminal justice system," Governor Cuomo said. "I'm proud that this hard-fought reform is now in effect, bringing us one step closer to a more fair and more just New York for all."

178.    In September 1990, the City of New York and its policymakers knew – to a moral certainty – that interrogating young suspects in the absence of any record, particularly in the pressurized environment of a high-profile murder investigation, was likely to lead to wrongful convictions as happened in this case.

179.    The policy of not recording interrogations proximately caused plaintiff to suffer over twenty-five years of wrongful imprisonment. During his incarceration, he sustained a variety of physical and emotional injuries.

## PLAINTIFF'S INJURIES AND DAMAGES

180.    Mr. Hincapie suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit. He was denied effective treatment for his emotional injuries while incarcerated and continues to suffer mental anguish to this day. For example, plaintiff fears police contact and his everyday activities are limited and disrupted by the traumas he has suffered in this case. He was imprisoned when his grandmother—with whom he had an extremely close relationship before he was incarcerated—passed away. He was not allowed to attend his grandmother's funeral.

181.    Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends. While he was incarcerated, he was denied the opportunity to spend quality time with his extremely close-knit family and to develop full relationships with his brother's children, let alone have children himself.

182.   Plaintiff was denied decades of gainful employment and income. His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

183.   Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated, in the most extreme manner possible. He is a figure of national outrage and disdain, for events in which he had no part. Nothing can undo the reputational damage he has sustained.

184.   Plaintiff and his family incurred substantial legal fees during the decades he spent seeking to defend himself and prove his innocence.

185.   Additionally, Mr. Hincapie claims, *inter alia*, loss of liberty; loss of enjoyment of life; continuing pain and suffering, including post-incarceration psychological issues; post-incarceration mental health treatment costs; lost earnings while incarcerated; impaired earning capacity and limitations on future employment opportunities; emotional distress; humiliation; indignities; embarrassment; degradation; physical injuries and lack of access to health care while incarcerated; attorneys' fees, and other pecuniary losses; and past pain and suffering.

## FIRST CLAIM
### Malicious Prosecution Under Federal and State Law

186.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

187.   Defendants Casey, Gonzalez, Christie, Ali, Borman, Swenson, Rosario, Rizzo, Santoro, Connelly and unidentified defendants, acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. Hincapie, without probable cause or other legal justification, by fabricating or coercing a confession they falsely attributed to Mr. Hincapie, fabricating false statements of other alleged participants, suppressing exculpatory statements and information and failing to disclose their misconduct, in reckless disregard of evidence demonstrating Mr. Hincapie's innocence.

188.   As described above, there was not even arguable probable cause to arrest or prosecute Mr. Hincapie, and no reasonable officer would have believed there was.

189.   Plaintiff's indictment was procured by fraud, negating any presumption of probable cause. Defendants Casey, Swenson, Rosario, Rizzo and Gonzalez provided a false account of the investigation and interrogations to the grand jury in bad faith, suppressing exculpatory evidence and corrupting the proceedings.

190.   For example, defendant Casey falsely stated to the grand jury that Johnny Hincapie had said during the interrogation that "the fellows plus himself had decided they were going to rob somebody" and that Hincapie had "actually seen the weapons," when Casey knew that Mr. Hincapie truthfully denied any knowledge of the crime or involvement in its planning and that the words attributed to him, and the entirety of

the written and videotaped statement, had been manufactured by Casey and the other defendants.

191.   Cospito was not called to testify before the grand jury.

192.   The prosecution ultimately terminated in Mr. Hincapie's favor – in a manner indicative of and predicated upon plaintiff's innocence – when his 440 motion was granted, the conviction was vacated and, after prosecutors appealed that decision and lost before a unanimous First Department panel, the indictment against him was dismissed. *See People v. Hincapie*, 142 A.D.3d 886, 38 N.Y.S.3d 137 (N.Y. App. Div. 2016).

193.   Indeed, plaintiff's certificate of disposition explicitly states: "The above mentioned dismissal *is a termination of the criminal action in favor of the accused* pursuant to Section 160.60 of the Criminal Procedure Law." (emphasis added). *See, e.g., Regeda v. City of New York*, 09 CV 5427 (KAM) (VVP), 2015 WL 5751117, *2 (E.D.N.Y. Sept. 30, 2015) ("This Certificate of Disposition [reflecting, as here, N.Y.C.P.L. § 160.60 dismissal] constitutes evidence that plaintiff's criminal charge was terminated in his favor in the context of a malicious prosecution claim.") (citing *Anderson v. City of New York,* 817 F.Supp.2d 77, 92 (E.D.N.Y. 2011)); *see also, e.g., Bellamy v. City of New York*, 12 CV 1025 (AMD) (PK), 2017 WL 2189528, *31

(E.D.N.Y. May 17, 2017), *aff'd in part, vacated in part, remanded on other grounds,* 914 F.3d 727 (2d Cir. 2019).

194.   As a direct and proximate result of individual defendants' misconduct, Mr. Hincapie was wrongfully convicted and deprived of his liberty for over twenty-five years, among other damages.

**SECOND CLAIM**
**Fabrication of Evidence in Violation of 4th & 14th Amendments; *Brady* Violations**

195.   Defendants Casey, Gonzalez, Christie, Ali, Borman, Swenson, Rosario, Rizzo, Santoro, Connelly and unidentified defendants deliberately fabricated inculpatory evidence and suppressed exculpatory evidence.

196.   Mr. Hincapie was then wrongly convicted based on the fabricated evidence and without the benefit of the exculpatory information.

197.   Defendants failed to adequately disclose exculpatory witness information, in violation of their obligations under *Brady*, including regarding Tannisha Vasquez and Ricardo Lopez, and otherwise suppressed favorable evidence as described above.

198.   Defendants coerced false statements from Pascual Carpenter, Ricardo Nova and Emiliano Fernandez to use as false evidence in procuring the conviction of Johnny Hincapie.

199.   Additionally, defendants coached and tampered with the testimony of Anthony Nichols, to corruptly deprive Mr. Hincapie of exculpatory information possessed by that witness.

200.   Such fabrication and suppression of evidence violated Mr. Hincapie's clearly established rights to a fair trial and to not be deprived of liberty without due process of law, as well as *Brady v. Maryland*.

201.   As a direct and proximate result of the individual defendants' fabrications, Mr. Hincapie was wrongfully convicted and suffered the injuries and damages described above.

<u>THIRD CLAIM</u>
§ 1983 Coercion

202.   Defendants Casey, Gonzalez, Christie, Ali and unidentified defendants isolated Johnny Hincapie – who had just turned eighteen and found himself in his first police encounter. The defendants engaged in, *inter alia*, a deliberate course of lies, trickery and deceit, threatening and inflicting bodily harm on plaintiff, giving him false assurances of leniency, false legal advice and promises that Mr. Hincapie would not be charged and would be taken home once he assented.

203.   Then, despite his protestations of innocence, in a custodial interrogation in which *Miranda* warnings and counsel were withheld – and no

recording made – plaintiff's will was ultimately overborn, and defendants induced Mr. Hincapie to sign the statement defendants had prepared, unwittingly and falsely incriminating himself in violation of his clearly established Fifth and Sixth Amendment right to be free from compelled self-incrimination and to be afforded access to counsel.

204.   Defendants' coercive and conscience-shocking interrogation tactics generated false and unreliable evidence used against Mr. Hincapie at trial, causing his wrongful conviction and all the injuries set forth above.

## FOURTH CLAIM
### § 1983 Supervisory Liability

205.   Supervisors, including, *inter alia*, Sergeant Ali, Sergeant Borman, Deputy Chief DeMartino, Sergeant Connolly, Sergeant Herbst, Lieutenant Mole, Captain Bayshim and unidentified defendants, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the NYPD or Transit PD,  with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of the detectives and police officers who deprived Mr. Hincapie of his clearly established constitutional rights.

206.   In the cases of Borman, Ali and Connelly and John Doe Supervisors, as described above, the supervisors were personally involved in the deprivation of Mr. Hincapie's constitutional rights.

207.   Supervisors DeMartino, Mole, Herbst, Bayshim, Borman, Ali, Connelly and John Doe Supervisors had responsibility over subordinate officers inside the Midtown North Precinct on September 3-4, 1990.

208.   These defendants had constructive, if not actual, knowledge of unconstitutional police tactics in use at that time.

209.   In failing to act to remedy the harm, the Supervisory Defendants exhibited deliberate indifference to the rights of Mr. Hincapie.

210.   In addition to their own direct involvement in the wrongful conduct, the supervisors were reckless in their supervision of the investigation and of the conduct of the subordinate defendants, and either knew or should have known that defendant officers were maliciously prosecuting civilians, fabricating and coercing confessions, suppressing exculpatory evidence, perjuring themselves as witnesses, and depriving civilians of due process of law.

211.   The Supervisory Defendants knew or in the exercise of due diligence would have known that the misconduct of themselves and the named and John Doe defendants against Mr. Hincapie was likely to occur and did occur.

212.   The failure of the Supervisory Defendants to train, supervise and discipline the named individual defendants and John Does amounted to gross negligence, deliberate indifference or intentional misconduct, which directly caused the injuries and damages set forth above.

## FIFTH CLAIM
*Monell* Claim for the City's Failure to Record Interrogations

213.   The City of New York had in force and effect in September 1990 and for years beforehand, a policy, practice and/or custom not to record police interrogations, including in pressurized high-profile murder investigations like the Watkins case.

214.   This policy, practice and/or custom was executed in deliberate indifference to plaintiff's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments.

215.   It was foreseeable to the City of New York that maintaining such a policy, practice and/or custom would result in constitutional violations of the type Mr. Hincapie suffered.

216.   This policy, practice and/or custom was the moving force behind plaintiff's constitutional deprivation and resulted in the damages alleged herein.

## SIXTH CLAIM
### False Arrest / Imprisonment Under Federal and State Law

217.   Defendants intended to confine Mr. Hincapie, and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps to ensure he was imprisoned on the basis of false evidence and without legal justification.

218.   Mr. Hincapie was conscious of the confinement and did not consent to it.

219.   As a direct and proximate result of defendants' actions, Mr. Hincapie was wrongly arrested and falsely imprisoned from September 3, 1990, until he was finally released on October 6, 2015, and suffered the other grievous and continuing damages and injuries set forth above.

## SEVENTH CLAIM
### Intentional or Negligent Infliction of Emotional Distress

220.   The deliberate conduct of the defendants in coercing and fabricating a false confession from a vulnerable and scared teenage boy for a murder they knew he did not commit, their ensuing refusal to investigate the matter properly, and their cover-up of the truth, perpetuated in public statements over many years, constitutes

the intentional infliction of emotional distress.

221.   In the alternative, defendants' conduct in coercing and fabricating a false confession and covering up the truth breached a duty of care owed to Mr. Hincapie as a citizen and as a criminal suspect, which unreasonably endangered his physical safety and caused him to fear for his own safety, constituting the negligent infliction of emotional distress.

222.   Defendants' conduct, falsely implicating Mr. Hincapie in the infamous Watkins murder and subjecting him to public stigma to this day notwithstanding the dismissal of charges against him, caused Mr. Hincapie to suffer ongoing, unimaginable emotional distress and traumatic psychological *sequelae*.

## EIGHTH CLAIM
### Failure to Intervene

223.  Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

224.   Those defendants that were present for but did not actively participate in the aforementioned unlawful conduct were aware of such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

225.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a)  Compensatory damages against all defendants, jointly and severally;

(b)  Punitive damages against the individual defendants, jointly and severally;

(c)  Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d)  Such other and further relief as this Court deems just and proper.

Dated:      May 3, 2019
            New York, New York

ELEFTERAKIS, ELEFTERAKIS & PANEK

_____
Gabriel P. Harvis
Baree N. Fett
80 Pine Street, 38th Floor
New York, New York 10005
(212) 532-1116
gharvis@eeplaw.com

*Attorneys for plaintiff*