UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                        :

JOHNNY HINCAPIE,                     :

              *Plaintiff*,       :

     *-against-*            :

                    :     18-CV-3432 (PAC)

CITY OF NEW YORK; Detective CARLOS  :
GONZALEZ; Detective DONALD CASEY;  :
Detective JAMES CHRISTIE; Detective  :    **OPINION & ORDER**
ARTHUR SWENSON; Detective JOSE  :
RAMON ROSARIO; Detective DANIEL  :
RIZZO; Detective MATTHEW SANTORO;  :
Sergeant SHARIF ALI; Sergeant JOHN  :
HERBST; Sergeant TIMOTHY CONNOLLY;  :
Sergeant GARY BORMAN; The Estate of  :
Deputy Chief JOSEPH DEMARTINO;  :
Lieutenant VICTOR MOLE; Captain "JOHN"
BAYSHIM; JOHN and JANE DOE
DETECTIVES 1-5; and JOHN and JANE DOE
SUPERVISORS 1-5,

              *Defendants.*

------------------------------------------------------------X

On September 2, 1990, Brian Watkins, a tourist from Utah, was stabbed to death on a New York City subway platform. In the immediate aftermath of the attack, officers from both the New York Police Department ("NYPD") and Transit Police Department ("Transit PD") interviewed and arrested a host of witnesses and suspects. Several suspects were prosecuted, convicted, and sentenced to lengthy prison stints. Some remained incarcerated decades later.

Until 2015, that group included Plaintiff Johnny Hincapie. On the night of the stabbing, it is undisputed that Hincapie was among the throng of teenagers who had travelled from Queens for an evening out in Manhattan. Hincapie's role in the subsequent events, however, is anything but undisputed.

1

Although he was arrested, convicted of robbery and second-degree murder, and sentenced to 25 years to life for his alleged role in Watkins' death, Hincapie has maintained his innocence across decades of appeals and collateral challenges.  Finally, in October 2015, his convictions were vacated in New York state court, and the District Attorney subsequently declined to retry the case. Hincapie filed this civil suit in April 2018, seeking damages and associated relief from the City of New York and a number of individual police investigators and officials.  In January 2020, the Court granted in part and denied in part Defendants' motion to dismiss the case, and the parties began a lengthy discovery process.

Defendants now move for partial summary judgment, contending that Hincapie has failed to uncover evidence substantiating several of his claims.  Because genuine issues of material fact exist as to some—but not all—of Hincapie's claims, Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

Although it reverberates throughout his many civil claims, the question of Hincapie's actual innocence is not at issue in this case.  The Court therefore examines the events of September 2, 1990, and the subsequent investigation, only to the extent appropriate to determine which of Hincapie's claims in this civil action may proceed to trial.

The following facts are undisputed unless otherwise indicated.

### I.    The Watkins Murder

On the night of September 2, 1990, Hincapie was among a large group of young people taking the subway in from Queens for an event at the Roseland Ballroom in Manhattan.  (Ex. B at 2, ECF No. 191-2.)  A small subset of the group—which may or may not have included Hincapie— targeted the Watkins family on the platform of the 7th Ave./53rd St. station.  (*Id.*)  In the chaos

that followed, the Watkins family was robbed and Brian Watkins was stabbed to death.  (*Id.*)

## II.    The Investigation Begins

Police investigating the incident first questioned Anthony Anderson and Luis Montero. Detective Casey's handwritten notes from Anderson's interview, dated September 3, 1990 at 2:30 AM, indicate that Anderson identified several additional participants and provided information as to their role in the robbery.  (*See* Ex. 38, ECF No. 191-38.)  At the time, Anderson made no statements concerning Hincapie, and in a 2009 affidavit he swore that Hincapie "never knew about the crime, nor did he engage in any of the planning."  (Anderson Aff. ¶ 6, ECF No. 191-17.)[1]

Montero's statements also did not implicate Hincapie.  Montero has testified that officers took him into a locker room where they beat him with a heavy paddle, "tried to choke" him, and pressured him to confess either that he "killed somebody" or that he "hit this lady and I hold [sic] her," adding that if he confessed "then it would be easier for me."  (Montero Dep. at 184–86, ECF No. 191-20.)  Although Montero maintains his innocence (and his charges were dropped), he has testified that at some point during his time in the locker room he "almost gave up"—that he was "almost about to break" and "do whatever they want so they would leave me be."  (*Id.* at 187.) Montero has been unable to identify the officers that beat and choked him.  (*Id.* at 186.)[2]

## III.    Hincapie Is Inculpated

Police next interviewed Ricardo Nova and Pascal Carpentier,[3] two of the men Anderson had identified as co-conspirators.  Nova and Carpentier were the first suspects to name Hincapie.

---

[1] Anderson would eventually be convicted for, and has admitted his own involvement in, the Watkins incident.  (*See* Anderson Aff. ¶¶ 4, 7.)

[2] Montero would ultimately be jailed for 18 months before the charges against him were dropped. (Ex. 16, ECF No. 191-16; Montero Aff. ¶ 57, ECF No. 191-49.)

[3] Carpentier's given name appears in the record as either "Pasqual" or "Pascal," and his surname appears as either "Carpentier" or "Carpenter."

*Carpentier.*    According to police records, Detectives Casey and Gonzalez began Carpentier's interview around 5:30 AM on September 3.  (Ex. G, ECF No. 185-6.)  Carpentier then handwrote a statement attesting he had "arrived at the train station with about 6 other people. We had decided to take these people's money."  (Ex. G; Ex. H, ECF No. 185-7.)  Listed among the people "who were with us" was "Johnny."  (Ex. H.)  In an interview that night with Assistant District Attorney Donna Henken ("ADA Henken"), Carpentier recalled being "with" "Johnny" along with "a whole bunch of kids going to the same club."  (Ex. I at 7, ECF No. 185-8.)

Carpentier has since backpedaled from these statements.  In a later unsigned affidavit,[4] he asserted that he recalled seeing Hincapie near a bench "at the upstairs level after arriving to the subway station," and that he was "completely uncertain" as to Hincapie's involvement in the Watkins incident.  (Carpentier Aff. ¶ 8, ECF No. 191-46.)  He further claimed that his statements

---

[4] District courts typically do not consider unsigned, unsworn affidavits when deciding a motion for summary judgment.  *See, e.g.*, *Romero v. H.B. Auto. Grp., Inc.*, No. 11-cv-386 (CM), 2012 WL 1514810, at *2 (S.D.N.Y. May 1, 2012) (citing *United States v. All Right, Title & Int. in Real Prop. & Appurtenances*, 77 F.3d 648, 657–58 (2d Cir. 1996)); *Meimaris v. Royce*, No. 18-cv-4363 (GBD) (BCM), 2018 WL 9960113, at *2 (S.D.N.Y. Nov. 5, 2018) (collecting cases); *see also Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[U]nsworn letters . . . are an insufficient basis for opposing a motion for summary judgment.").  Meanwhile, district courts also have significant discretion under Rule 56(e)(1) of the Federal Rules of Civil Procedure to allow a party an "opportunity to properly support or address" an improperly supported fact.  *See DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009) ("The district court has broad discretion in permitting supplementation of the summary judgment record, which this court reviews for abuse-of-discretion."); *see also Capobianco*, 422 F.3d at 55 (Second Circuit holding that the district court abused its discretion when it granted defendant's motion for summary judgment without first allowing the nonmovant the opportunity to submit an affidavit to cure a deficient, unsworn physician letter).

In this case, the Court will—for the present—consider the unsigned affidavit, which plaintiff's counsel has declared to be authentic under penalty of perjury pursuant to 28 U.S.C. § 1746 (*see* Harvis Decl. ¶ 46, ECF No. 191), and allow Hincapie 60 days to cure the deficiency by submitting a valid affidavit or otherwise showing cause why the unsigned affidavit should be considered.  *See Parks v. Blanchette*, No. 3:09-cv-604 (VAB), 2015 WL 1970526, at *1 (D. Conn. May 1, 2015) ("Giving a party another opportunity to support or address a fact will often be the best option, minimizing the chance of an unjust result based on an inadequate record.") (cleaned up).

to Detectives Casey and Gonzalez were "only repetitions" of things the detectives had dictated to him—details Carpentier had assumed the detectives already knew and "which [Carpentier] otherwise did not know." (*Id.* ¶¶ 2, 7.) He recalled feeling "very intimidated" by the detectives' "threatening manner," and therefore gave false information "due to my fear of being pinned for murder if I did not admit to more than actually happened"—"[w]henever I told them that I did not know anything, [Detective] Casey would angrily mock me and threaten to have me go down for the whole rap." (*Id.* ¶¶ 2, 6.) According to Carpentier, Detectives Casey and Gonzalez did not inform him of his Miranda rights until after he had finished his written statement. (Ex. I at 2.)

For his part, Detective Casey has acknowledged that he was "severe" in his interactions with Carpentier: "I didn't have a conversation. I had an interrogation. Big difference." (Casey Dep. at 270–71, ECF No. 191-6.) He has further confirmed Carpentier's account that the written statement was the product of Detective Gonzalez dictating what Carpentier should write, and Carpentier obliging. (Ex. 4m at 00:00:00–00:02:05, ECF No. 191-4m.)[5]

*Nova.* Shortly after the start of Carpentier's interview, Sergeant Borman and Detective Rosario began questioning Nova. Sergeant Borman would later testify that no Miranda warning was given until an hour and a half into the interview. (Ex. 39 at 761, ECF No. 191-39.) At some point, Detective Rosario handwrote a statement, which Nova signed, asserting that after taking the subway to the 7th Ave./53rd St. station, "we"—referring to Nova and a list of names that included "Johnny"—"decided to rob someone for money to get into Roseland." (Ex. C at ECF pagination 3, ECF No. 185-2.) Detective Rosario's handwritten notes from this interview include a question mark after several of these names, including after "Johnny." (Ex. 43, ECF No. 191-43.)

---

[5] Like Hincapie, Carpentier was convicted of second-degree murder, first-degree robbery, and second-degree robbery, and sentenced to 25 years to life in prison. *See People v. Carpenter*, 619 N.Y.S.2d 537 (N.Y. App. Div. 1st Dep't 1994).

A few hours later, Detective Swenson asked Nova to handwrite a statement himself. (Ex. C at ECF pagination 6.) Here, Nova wrote that a group including himself, "Jonny," and several others "decided to rob someone for money to buy tickets for Roseland." (*Id.* at ECF pagination 7.) He did not mention "Jonny" in his detailing of the various participants' roles in the robbery itself. (*Id.* at ECF pagination 7–8.) Later that evening, when interviewed by ADA Henken, Nova included "Johnny" in the list of people who "went downstairs to the [subway] platform" where the robbery occurred. (Ex. D at 11, ECF No. 185-3.)

Robert Dennison, a former parole board commissioner who spent time in the early 2010s re-investigating Hincapie's involvement in the Watkins incident, has testified that Nova told Dennison he "didn't remember" whether Hincapie was present during the robbery. (Dennison Dep. at 11, 20, 34, ECF No. 191-12.) According to his attorney in 1990, Nova alleged generally that his statements to police "were coerced from him by the overly aggressive techniques of the Detectives involved in the investigation of this matter." (Ex. 45 ¶ 7(k), ECF No. 191-45.)[6]

## IV.    The Investigation Continues

Throughout the morning and afternoon of September 3, 1990, detectives continued interviewing their way through a number of suspects and witnesses.

*Aldridge.* At approximately 7:00 AM, according to police records, Detective Swenson interviewed Keith Aldridge, who was among the crowd of young people who had made the trek to Roseland. (Ex. 44, ECF No. 191-44.) Aldridge reportedly identified a group of five people who had stayed behind after the larger group exited the subway; he did not name Hincapie. (*Id.*)

Aldridge has subsequently testified that, upon arriving at the precinct, he was taken to a

---

[6] Nova was also convicted of second-degree murder, first-degree robbery, and second-degree robbery, and sentenced to 25 years to life in prison. *See People v. Nova*, 618 N.Y.S.2d 645, 646 (N.Y. App. Div. 1st Dep't 1994).

room by two detectives and pressured into providing additional information that he did not know "because I wasn't there." (Aldridge Dep. at 115–16, ECF No. 191-8.) Aldridge has said he "could tell that they wanted me to say things" or "just blame people," and that when he was unable to do so, the detectives became "more aggressive." (*Id.*) At that point, according to Aldridge, one detective "put his hand around my neck," "pushed me down to the floor," and "started making threats" such as "I'll bash your head in" and, after pulling Aldridge's chair and forcing him forward, "I'm going to bash your head into the ground." (*Id.* at 116, 121.) As the session went on, "it started being good cop/bad cop"; for example, after some detectives had taken Aldridge's chair from him, the "good guy came and gave me back the chair." (*Id.* at 115, 121.)[7]

*Lopez.* Around 3:00 PM, according to police records, Detective Swenson also interviewed Ricardo Lopez. (Ex. K, ECF No. 185-10.) Detective Swenson's notes indicate Detective Casey was present as well. (Ex. 61, ECF No. 191-61.) According to Swenson's report of this interview, Lopez identified "Johnny" as one of eight people who "lagged behind" intending to "rob someone," knowing that one member of the group had a knife. (Ex. K at ECF pagination 2.) Lopez's accompanying handwritten statement did not mention "Johnny." (Ex. L, ECF No. 185-11.) Later that evening, when interviewed by ADA Henken with Detectives Casey and Swenson present, Lopez clarified that Hincapie had been among the eight that initially stayed behind in the station, but that "Johnny and Kevin left" before the robbery, leaving a group of just six. (Ex. M at 11–12, ECF No. 185-12.) Those six, Lopez explained, committed the robbery. (*Id.* at 12–13.)[8]

Lopez's statement that "Johnny" had "left" before the robbery took place was disclosed to

---

[7] In his memorandum of law, Hincapie represents that Aldridge was never charged in the Watkins case. (*See* Pls.' Oppo. at 14, ECF No. 189.)

[8] Lopez was convicted of second-degree murder, first-degree robbery, and second-degree robbery, and sentenced to 25 years to life in prison. *See People v. Lopez*, 630 N.Y.S.2d 736 (N.Y. App. Div. 1st Dep't 1995).

Hincapie prior to his criminal trial.  *See Hincapie v. Greiner*, 155 F. Supp. 2d 66, 69 (S.D.N.Y. 2001) (describing Hincapie's unsuccessful attempts to admit this statement into evidence at trial).[9]

   ***Fernandez.***  Around 4:40 PM, Detectives Christie, Rizzo, and Santoro interviewed Emilio Fernandez.  (Ex. O, ECF No. 185-14; Ex. P, ECF No. 185-15.)  In a handwritten statement, Fernandez identified several people who "said they were short money" while riding the subway: himself, "'Heman,' 'Score' and 'Rockstar.'"  (Ex. Q at ECF pagination 3, ECF No. 185-16.)  The words "and Kevin, and Johnny DR EF" were then added in the margin between lines.  (*Id.*)  The handwritten statement went on to list Johnny and Kevin—not in the margins this time—as among the group of nine who "went down to the platform to look for someone to rob."  (*Id.*)  "Johnny" was not mentioned in Fernandez's detailed account of the robbery itself, which also included several apparent edits in the margins.  (*Id.* at 2–3.)  Later that evening, Fernandez largely repeated the same story to ADA Henken, but with fewer specifics; the portion of the transcript provided to the Court does not mention "Johnny."[10]  (*See generally* Ex. R, ECF No. 185-17.)

   In his earlier interview, Fernandez had also provided a surname and phone number for the young man that had, to this point, been referred to only as "Johnny."  (Ex. P.)  According to Detective Christie, Detective Cospito used this information to track down Hincapie's address using a trick known as the "Russo scam"—i.e., calling a phone number posing as a utility provider to

---

[9] *Aff'd*, 56 F. App'x 61 (2d Cir. 2003), *cert. denied*, 540 U.S. 905 (2003).

[10] In their Local Rule 56.1 Statement, Defendants assert that on page 8 of the transcript of Fernandez's interview with ADA Henken, he "stated that Johnny was amongst the eight that went back downstairs."  (Defs.' Rule 56.1 Stmt. ¶ 105.)  But neither that portion, nor any other portion of the transcript provided to the Court, mentions "Johnny" or makes any other apparent reference to Hincapie.  (*See generally* Ex. R.)

convince the call recipient to disclose their address.  (Christie Dep. at 66–68, ECF No. 191-3.)[11]

## V.     Hincapie Is Interrogated

According to Hincapie, law enforcement arrived at his house around 8:00 or 9:00 PM on September 3.  (Hincapie Dep. at 424, ECF No. 185-21.)  Detectives then escorted him to the precinct handcuffed, with a coat covering his head.  (*Id.* at 424–25.)  Upon arriving, he was taken to an area of the precinct with benches, and the coat was removed from his head.  (*Id.*)  According to Detective Casey, at some point after Hincapie arrived at the precinct, Detective Christie reported "who he had" to Detective Casey, and "that the person he brought in wanted to make a statement." (Ex. 58, ECF No. 191-58.)  Then, after conferring with each other, a group of detectives that included at least Detectives Christie and Gonzalez escorted Hincapie into a room where Detective Casey was already waiting.  (Hincapie Dep. at 425–27.)

According to Hincapie, Detective Casey was laying down on a bunk bed and smoking a cigarette when Hincapie entered.  (*Id.* at 425–27.)  Detective Casey introduced himself and invited Hincapie to sit in a nearby chair.  (*Id.* at 429.)  The detectives then exited the room, leaving Hincapie alone for some amount of time before they returned.  (*Id.* at 433.)  According to Hincapie, Detective Christie asked Hincapie if he was hungry and, after Hincapie responded "yes," Detectives Christie and Gonzalez left the room.  (*Id.*)  Now alone—per Hincapie's recollection— with Hincapie, Detective Casey asked what had happened the night before and, upon hearing Hincapie's story, remarked "[y]ou are a liar," blew smoke in Hincapie's face, and began "using racial slurs."  (*Id.* at 439–40.)  Detective Casey then "went crazy" on Hincapie.  (*Id.* at 440.)

Eventually, according to Hincapie, after picking Hincapie back up, Detective Casey

---

[11] Fernandez was convicted of second-degree murder, first-degree robbery, and second-degree robbery, and sentenced to 25 years to life in prison.  *See People v. Fernandez*, 618 N.Y.S.2d 708 (N.Y. App. Div. 1st Dep't 1994).

remarked that Hincapie was "making things complicated for [Detective Casey]." (*Id.*) Hincapie responded that he "wasn't lying" and that he was "scared." (*Id.*) Detective Casey explained that if Hincapie "wanted to go home, it was to [Hincapie's] benefit that [Hincapie] memorize the story"—he would then be "returned home immediately." (*Id.*) When Hincapie asked about having an attorney advise him, Detective Casey replied that an attorney would agree that Hincapie should memorize Detective Casey's story. (*Id.* at 440, 442.) Detective Casey then "rehearsed" with Hincapie by dictating the story to Hincapie, who would in turn echo those dictations back to Detective Casey. (*Id.* at 442–43.) The essence of the rehearsed narrative, per Hincapie, was "[t]hat I didn't have enough money to get inside the club, that I grabbed a woman, that everybody else didn't have enough money to get inside, and that's why they committed the robbery." (*Id.*)

After Hincapie had memorized this story, Detective Casey left the room and returned with Detective Christie. (*Id.* at 448–49.) Detective Christie, who had brought food, complained that Hincapie "couldn't eat the food when [he] was still handcuffed." (*Id.*) In response, Detective Casey removed the handcuffs, allowing Hincapie to take a few bites of his hamburger and a few sips of his soda. (*Id.*) When Detective Christie then asked Hincapie to recount what had happened the night before, Hincapie "just repeated what Detective Casey had told [Hincapie]." (*Id.* at 450.)

There is conflicting evidence regarding who was in the room at various points during Hincapie's interview. Detective Christie has at times denied leaving the room to get food, once testifying that he "was there the entire time before the statement was taken." (Ex. 1 at 641, ECF No. 191-1.) At other times, he has testified that although he did not get Hincapie's food, he "went with the guy who got it"—a plainclothes officer whom Detective Christie did not know—and that they were gone for about "15, 20 minutes." (Christie Dep. at 119–20.) According to Detective Christie, when they stepped out, Detective Casey was "still on the bed," Detective Cospito was "in

the room," and Detective Gonzalez was "behind us 10 feet more." (*Id.* at 120.) For his part, Hincapie has testified that he "do[es]n't think" Detective Gonzalez was in the room. (Hincapie Dep. at 449.)

Later that day, Hincapie was interviewed by ADA Henken. (Henken Dep. at 45, ECF No. 185-22.) The following day, he appeared before the victim's mother in a police line-up; police records indicate she said he looked "vaguely familiar." (Ex. U, ECF No. 185-20; Ex. B at 5.)

## VI.   Charges are Filed

Ultimately, ADA Henken, in consultation with deputy bureau chief Dan McNulty, decided which suspects to charge, which suspects not to charge, and what the charges would be. (Henken Dep. at 45, 48–49, 144.) In addition to the interviews she had personally conducted, ADA Henken had at her disposal the statements that several suspects—including Carpentier, Nova, Lopez, and Fernandez—had made to detectives. (*Id.* at 45; Ex. I at 2; Ex. D at 3; Ex. M. at 3; Ex. R at 2; *see also* Ex. 28, ECF No. 191-28.) She has also testified that she believes she "talked to the detectives about what Mr. Hincapie said during his interrogation with them." (Henken Dep. at 45.)

## VII.   Procedural History

Like many of his fellow suspects, Hincapie was convicted of murder in the second degree, two counts of first-degree robbery, and two counts of second-degree robbery, and sentenced to 25 years to life in prison. *See People v. Hincapie*, 629 N.Y.S.2d 416, 416 (N.Y. App. Div. 1st Dep't 1995), *appeal denied*, 658 N.E.2d 230 (1995). This disposition withstood Hincapie's direct appeal, *id*, two early motions to vacate the convictions pursuant to C.P.L. § 440.10., *see id.*, and a subsequent habeas petition, *see Hincapie v. Greiner*, 56 F. App'x 61 (2d Cir. 2003), *cert. denied*, 540 U.S. 905 (2003). Ultimately, Hincapie served nearly 25 years before a New York court vacated his convictions in October 2015 pursuant to a third C.P.L. § 440.10 motion. (*See* Ex. B at

1, 9.)[12]  Although it emphasized that Hincapie had "not established that he is actually innocent by clear and convincing evidence" (*id.* at 33), the New York court held that several pieces of newly discovered evidence—including the discovery of three witnesses who could testify "that Hincapie was not on the subway platform at the actual moment of the robbery of the Watkins family"— warranted vacating his conviction and ordering a new trial.  (*Id.* at 35–42.)  In January 2017, the District Attorney declined to retry Hincapie.  (*See* ECF No. 102-4.)

Hincapie filed this lawsuit in April 2018 seeking damages and related relief from the City of New York and a slew of individual law enforcement personnel.[13]  (ECF No. 1.)  In May 2019, he filed an amended complaint (the "Complaint"), terminating some of the individual defendants originally named.  (ECF No. 97.)  Later that month, Defendants moved to dismiss the Complaint (*see* ECF No. 101) prompting a January 2020 order granting in part and denying in part the dismissal motion.  *See Hincapie v. City of New York*, 434 F. Supp. 3d 61 (S.D.N.Y. 2020).  Just under two years later, Defendants filed this motion for partial summary judgment.[14]

## DISCUSSION

Hincapie initially asserted eight separate grounds for relief: (1) malicious prosecution; (2) denial of fair trial through fabrication of evidence and *Brady* violations; (3) coercion; (4) supervisory liability; (5) *Monell* liability against the City of New York; (6) false arrest and imprisonment; (7) intentional or negligent infliction of emotional distress; and (8) failure to intervene.  The Court granted Defendants' motion to dismiss the *Monell* and false arrest and

---

[12] *See People v. Hincapie*, 38 N.Y.S.3d 137 (N.Y. App. Div. 1st Dept. 2016) (affirming vacatur).

[13] Hincapie subsequently filed a second civil suit in the New York Court of Claims seeking over $100 million in damages from the State of New York.  *See Hincapie v. State of New York*, NYSCEF No. 1, Claim No. 132279 (N.Y. Ct. Cl. November 16, 2018).

[14] The motion is docketed at ECF No. 184, with supporting materials at ECF Nos. 185, 186, 187, 188, 193, and 194.  Hincapie's opposition materials are docketed at ECF Nos. 189, 190, and 191.

imprisonment claims.[15]  *Hincapie*, 434 F. Supp. 3d at 77–78.  Defendants now move for partial summary judgment as to most of the remaining claims.

Upon review of the evidentiary record, the Court finds that some—but not all—of the remaining claims must now be dismissed.  Specifically, it concludes that four of Hincapie's claims—coercion, fabrication of evidence, malicious prosecution, and failure to intervene—may proceed to trial with respect to three Defendants: Transit PD Detective Donald Casey, and NYPD Detectives James Christie and Carlos Gonzalez.  The Court however grants summary judgment as to these claims with respect to all other Defendants.  It also dismisses Hincapie's *Brady*, supervisory liability, and emotional distress claims with respect to all Defendants.

## I.     Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law . . . ."  Fed. R. Civ. P. 56.  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal quotation marks omitted).

At the summary judgment stage, courts must act "with caution"—they "may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."  *Anderson*, 477 U.S. at 255.  They must therefore "construe all evidence in the light most favorable to the nonmoving party."  *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (internal citations omitted).  "Assessments of credibility and choices between

---

[15] The Court also granted Defendants' motions to dismiss all claims against certain individual defendants for lack of personal involvement.  *Hincapie*, 434 F. Supp. 3d at 71.

conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks omitted). "In other words, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." *Massey v. Morgan*, No. 18-cv-3994 (ALC), 2021 WL 3887947, at *4 (S.D.N.Y. Aug. 31, 2021) (internal citations omitted).

On the other hand, certain limitations constrain the evidence a nonmovant may rely upon to survive summary judgment. The nonmovant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Moreover, although the nonmoving party need not "produce evidence in a *form* that would be admissible at trial in order to avoid summary judgment," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (emphasis added), the nonmovant may rely only on evidence that is "*capable* of presentation in admissible form." *Cruz v. City of New York*, No. 15-cv-7731 (LTS), 2017 WL 3841870, at *2 n.1 (S.D.N.Y. Sept. 1, 2017) (emphasis added).

## II.    Analysis

### a.    Heck and Collateral Estoppel

The Court first addresses two threshold questions implicated in Defendants' motion for summary judgment: that some of Hincapie's claims are barred as a matter of law under, alternatively, (1) the *Heck* doctrine or (2) collateral estoppel.

The Court finds little merit in either argument.

#### i.    The Heck Doctrine

In *Heck v. Humphrey*, the Supreme Court held that when a state prisoner seeks damages in a § 1983 suit, the district court "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of *his* conviction or sentence" and, if so, dismiss the plaintiff's

claims unless the plaintiff demonstrates that *his* conviction or sentence has been reversed, expunged, invalidated, or "called into question" through the issuance of a habeas writ.  512 U.S. 477, 487 (1994) (emphasis added).  In this case, Hincapie's own convictions have been vacated. Thus, Defendants' theory hinges on whether *Heck* also requires dismissal of a plaintiff's § 1983 suit where a judgment in the plaintiff's favor would imply the invalidity of *somebody else's* conviction or sentence.

It is not at all clear that *Heck* erects any such barrier to so-called "third-party" suits. Although the Second Circuit has yet to address this question head-on,[16] one intra-Circuit district court declined to dismiss, on *Heck* grounds, a third-party suit brought under § 1983.  *See Waller v. Smith*, 403 F. Supp. 3d 164, 172 (W.D.N.Y. 2019).  The *Waller* court reasoned that the *Heck* doctrine is meant to "ensure[] that prisoners do not circumvent habeas remedies."  *Id.* ("[S]uch a concern does not extend to the civil rights claims of third parties.") (internal quotation marks omitted); *see Heck*, 512 U.S. at 480 ("This case lies at the intersection of the two most fertile sources of federal-court prisoner litigation—  . . .  § 1983, and the federal habeas corpus statute . . . .").  On *this* point, the Second Circuit has not been silent.  It has held that *Heck* does not bar § 1983 suits brought by plaintiffs who have no habeas recourse.  *See Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999); *Jenkins v. Haubert*, 179 F.3d 19, 27 (2d Cir. 1999) ("[S]ome federal remedy—either habeas corpus or § 1983—must be available.")*.*  Against this backdrop, the *Waller* court declined to dismiss a third-party plaintiff's complaint because that plaintiff had not "been

---

[16] While Defendants have correctly identified a Ninth Circuit case that endorsed extending *Heck* to bar a third party's § 1983 suit in certain, narrow circumstances, *see Beets v. Cty. of Los Angeles*, 669 F.3d 1038, 1048 (9th Cir. 2012), there is conflicting authority from other circuits.  *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 616 (6th Cir. 2014); *Eberhardinger v. City of York*, 782 F. App'x 180, 183 n.2 (3d Cir. 2019) (non-precedential opinion).

convicted of any crimes, and therefore cannot be seeking to challenge the legality of a conviction through a habeas remedy (because it is not available to her)."  403 F. Supp. 3d at 172.

This Court finds this reasoning persuasive, and agrees that even if *Heck* may constrain certain "third-party" plaintiffs, it does not apply where, as here, the "third-party" plaintiff does not stand convicted of a crime, and therefore lacks a habeas remedy in the first place.  Furthermore, even if *Heck* were implicated here, it would not preclude Hincapie's claims because those claims do not *necessarily* imply the invalidity of any of his former co-defendants' convictions.  *See Nelson v. Campbell*, 541 U.S. 637, 647 (2004) ("[W]e were careful in *Heck* to stress the importance of the term 'necessarily.'"); *McKithen v. Brown*, 481 F.3d 89, 102 (2d Cir. 2007)) ("[T]hat a prisoner's success might be merely helpful or *potentially* demonstrative of illegal confinement is, under this standard, irrelevant.") (emphasis in original).

Thus, to the extent Defendants' summary judgment motion relies on *Heck*, it is denied.

ii.   *Collateral Estoppel*

So too does the Court reject Defendants' bid for summary judgment under New York's doctrine of collateral estoppel.[17]

***Hincapie's Own Prosecution.***  As a preliminary matter, under New York law, there can be no collateral estoppel stemming from the judgment in Hincapie's *own* state prosecution because that judgment has been vacated.  *See Wilson v. City of New York*, 78 N.Y.S.3d 363, 367 (N.Y. App. Div. 2d Dep't 2018) ("[W]hen no order or final judgment has been entered on a verdict or decision, or when the judgment is subsequently vacated, collateral estoppel is inapplicable.")

---

[17] "Because the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state, New York preclusion law applies."  *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 93 (2d Cir. 2005).

(internal quotation marks omitted); *see also McCray v. City of New York*, No. 03-cv-10080 (DAB), 2007 WL 4352748, at *12 (S.D.N.Y. Dec. 11, 2007) (collecting cases).

       ***Former Co-Defendants' Prosecutions.***   New York's doctrine of collateral estoppel precludes a party from relitigating "an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Mangano v. Cambariere,* No. 04-cv-4980 (SCR), 2007 WL 2846418, at *8 (S.D.N.Y. Sept. 27, 2007) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir. 1994)). "New York courts freely admit that as a matter of law, the definition of privity is amorphous." *Hallinan v. Republic Bank & Tr. Co.*, 519 F. Supp. 2d 340, 358 n.33 (S.D.N.Y. 2007) (internal quotation marks omitted).[18]  They have disavowed "strict reliance on formal representative relationships" in favor of a more wholistic inquiry into whether the "facts and circumstances" of a case establish a "functional representation such that 'the nonparty may be thought to have had a vicarious day in court.'" *Mario Valente Collezioni, Ltd. v. AAK Ltd.*, No. 02-cv-0099 (RPP), 2004 WL 724690, at *8 (S.D.N.Y. Mar. 26, 2004) (quoting *Slocum on Behalf of Nathan "A" v. Joseph "B"*, 588 N.Y.S.2d 930, 931 (N.Y. App. Div. 3d Dep't 1992)).  The fundamental inquiry is whether the parties purportedly in privity enjoyed "a relationship that would justify preclusion, and whether preclusion, with its severe consequences, would be fair under the particular circumstances." *Hunt v. Enzo Biochem, Inc.*, No. 06-cv-170 (SAS), 2009 WL 1683990, at *5 (S.D.N.Y. June 15, 2009)[19] (quoting *Buechel v. Bain*, 766 N.E.2d 914 (N.Y. 2001)).  "[W]here privity is in question, '[d]oubts should be resolved against imposing preclusion to ensure that the party to be bound can be

---

[18] *Aff'd*, 306 F. App'x 626 (2d Cir. 2009).

[19] *Aff'd sub nom. Pope v. Enzo Biochem, Inc.*, 432 F. App'x 7 (2d Cir. 2011).

considered to have had a full and fair opportunity to litigate.'" *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 148–49 (S.D.N.Y. 2015) (quoting *Buechel*, 766 N.E.2d at 920).

The summary judgment record does not reflect that privity exists here.  Although Hincapie was tried alongside several (but not all) co-defendants (*see* Ex. B at 5), there is insufficient evidence for the Court to infer that he either exercised "control" over, or had his interests "adequately represented" in, his former co-defendants' proceedings—which included not only trial, but extensive post-trial litigation.  *See United States v. 111 E. 88th Partners*, No. 16-cv-9446 (PGG), 2020 WL 1989396, at *12 (S.D.N.Y. Apr. 27, 2020) (internal quotation marks omitted) (no privity where litigating party had not "agreed to vindicate the interests" of subsequent party).

To the contrary, the evidence suggests, at best, only a tangential intersection between Hincapie's interests and those of his former co-defendants.  Defendants' contention that all of the suspects had an "identical legal interest in suppressing either their own statements or the statements of others inculpating them" (Defs.' Mem. at 13, ECF No. 188) ignores crucial context: that the Watkins proceedings involved some co-defendants arguing that they, *unlike* their colleagues, were not involved in a crime that they did not dispute actually occurred.  (*See* Ex. B at 4–6.)  Thus, although these co-defendants had a formidable interest in suppressing statements inculpating *themselves*, their interest in suppressing statements inculpating *others* was not necessarily as robust.  *See E. River Hous. Corp.*, 90 F. Supp. 3d at 149 (no collateral estoppel where the relevant parties' interests were not "coextensive"); *see also Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995) ("Privity may exist for the purpose of determining one legal question but not another . . . ."); *cf. Mario Valente*, 2004 WL 724690, at *9 (finding privity where the parties had the "same" interests, and had entered into an indemnity agreement).

To the extent there was in fact greater alignment between Hincapie and other suspects, it is not reflected in the current record. *See BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 678 (2d Cir. 1997) (holding that because "very little" of "the apparently extensive" record of the prior proceedings had been submitted to the district court, "the demanding burden defendants bear to establish collateral estoppel" on summary judgment had not been met). The Court can only evaluate the evidence it has at its disposal. And the apparently—at best—partial overlap in interest between Hincapie and his former co-defendants reflected in that record cannot justify the "severe consequences" of preclusion. *E. River Hous. Corp.*, 90 F. Supp. 3d at 148–49.

The Court thus declines to dismiss any of Hincapie's claims on collateral estoppel grounds.

**b.    Coercion**

Turning next to Hincapie's substantive grounds for relief, the Court first addresses his coercion claims. Defendants do not, at this stage, seek dismissal of the coercion claims against Detective Casey.[20] Instead, they argue that because there is no evidence that Detective Christie, Detective Gonzalez, or Sergeant Ali were personally involved in the purportedly coercive portions of Hincapie's interrogation, the coercion claims against these Defendants should be dismissed.

*i.    Detectives Christie and Gonzalez*

With respect to Detectives Christie and Gonzalez, the Court disagrees. "Personal involvement may be established by a showing of direct participation, that is, 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, 'such as ordering or helping others to do the unlawful acts.'" *Israel v. City of New York*, No. 16-

---

[20] Defendants thus apparently concede, and the Court agrees, that there are genuine issues of fact as to whether the circumstances of Hincapie's interrogation satisfy the definition of coercion. *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998); *Thomsen v. City of New York*, No. 15-cv-2668 (DLC), 2016 WL 590235, at *9 (S.D.N.Y. Feb. 11, 2016). The Court thus focuses its analysis on the extent of each Defendant's personal involvement.

cv-6809 (PGG), 2018 WL 11219076, at *4 (S.D.N.Y. Sept. 29, 2018) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)).

As a preliminary matter, there is conflicting evidence concerning who was in the room throughout Hincapie's interrogation. Although Hincapie recalls being left alone with Detective Casey for a significant portion of his interview, Detective Christie has said otherwise—at times testifying that he remained in the room throughout the interview, and at other times testifying to leaving the room while Detectives Gonzalez and Cospito[21] remained with Hincapie and Detective Casey. There is therefore a genuine fact dispute regarding the extent of Detective Christie's and Detective Gonzalez's direct involvement in coercing Hincapie's confession.

For that matter, even if Detective Casey was indeed alone with Hincapie for much of the interrogation, that would not preclude a jury from concluding that Detectives Christie and Gonzalez were indirectly involved. The record is replete with evidence that the detectives who interfaced with Hincapie before, during, and after his interrogation were in coordination with one another. There is evidence (1) that Detectives Christie, Gonzalez, and Casey conferred with one another between Hincapie's arrival at the precinct and his interview; (2) that once Hincapie was in the interview room, Detectives Christie, Gonzalez, and Casey left and returned together; (3) that after he had shoehorned a confession into Hincapie, Detective Casey left the room to fetch Detective Christie; and (4) that when they returned with food, Hincapie promptly regurgitated the rehearsed story back to them. A reasonable jury could infer from this evidence that Detectives Christie and Gonzalez indirectly participated in—that is, coordinated and helped to facilitate—the unlawful coercion spearheaded by Detective Casey. *See Taylor v. City of New York*, No. 19-cv-

---

[21] Detective Cospito is not named as a defendant in this case. The Complaint alleges he passed away in 2011. (Compl. ¶ 114.)

6754 (KPF), 2022 WL 744037, at *11 (S.D.N.Y. Mar. 11, 2022) (triable issue of fact existed as to a police officer's personal involvement with an arrest where the officer communicated with the arresting officers and "helped corral" the arrestee's personal items).

Thus, issues of fact preclude summary judgment as to the coercion claims against Detectives Christie and Gonzalez.

ii.   *Sergeant Ali*

However, Hincapie has failed to produce any evidence linking Sergeant Ali, either directly or indirectly, to the alleged coercion.  The proffered barebones excerpts from Sergeant Ali's spiral notebook pertaining to Hincapie—which include a few jotted names, addresses, and times—do not suggest that Sergeant Ali had any direct or indirect involvement in Hincapie's interrogation. (*See* Ex. 67, ECF No. 191-67.)

Therefore, summary judgment is granted as to the coercion claim against Sergeant Ali.

**c.   Denial of Fair Trial**

Hincapie next claims he was denied a fair trial through Defendants' (1) fabrication of inculpatory evidence against him, and (2) failure to disclose exculpatory evidence under *Brady*.

i.   *Fabrication of Evidence*

"The Second Circuit has explained that fair trial claims based on fabrication of information are restricted to those cases in which an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result."  *Snead v. City of New York*, 463 F. Supp. 3d 386, 392 (S.D.N.Y. 2020)[22] (cleaned up) (quoting *Garnett v. Undercover Officer*

[22] *Reconsideration denied sub nom. Snead v. LoBianco*, No. 16-cv-09528 (AJN), 2021 WL 861060 (S.D.N.Y. Mar. 8, 2021).

*C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).  Defendants do not challenge four of these five factors at this stage.  They target only the second factor, arguing that the summary judgment record is devoid of any evidence of fabrication.

*Detectives Casey, Christie, and Gonzalez.*  With respect to Detectives Casey, Christie, and Gonzalez, the Court disagrees.  To start, the Court has already found that a genuine dispute exists as to whether these three detectives coordinated to manufacture a false confession from Hincapie.[23]

There is further evidence that Detectives Casey and Gonzalez employed a similar approach in their interview of Carpentier.  Carpentier's recollections suggest that he agreed to parrot statements concerning Hincapie dictated to him by Detective Gonzalez—statements Carpentier admits he had no independent knowledge of—only because he felt "intimidated" by his interrogators' "threatening manner," including their angry and derisive threats to pin the "whole rap" on him.  (Carpentier Aff. ¶ 2.)  Detective Casey has echoed portions of this account, emphasizing that the interview was "severe" and taking care to flag the "[b]ig difference" between

---

[23] Hincapie does not specifically list this interview within the portion of his Complaint articulating the legal theory for his fabrication of evidence claim.  (*See* Compl. ¶¶ 195–201.)  However, this portion of the Complaint does specify that the fabrication claim is asserted against each of the Defendants who were involved in Hincapie's interrogation (*see* Compl. ¶ 195) and, in any event, the facts alleged throughout the Complaint amount to a fabrication claim that encompasses this interrogation.  *See Oneida Indian Nation of New York v. Cty. of Oneida*, 617 F.3d 114, 139 (2d Cir. 2010) ("[T]he essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated."); *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 438 n.6 (S.D.N.Y. 2014) (permitting alternate theories of liability to survive summary judgment even though the complaint had only explicitly referenced one such theory).

a mere "conversation" and a full-blown "interrogation" of this kind.  (Casey Dep. at 270–71.)  All told, this is sufficient for a jury to reasonably conclude the Carpentier evidence was fabricated.[24]

The Court therefore denies Defendants' motion for summary judgment as to the fabrication of evidence claims against Detectives Casey, Christie, and Gonzalez based on their roles in the Hincapie and (for Detectives Casey and Gonzalez only) Carpentier interviews.

***Other Defendants.***   However, the Court agrees there is insufficient evidence for a reasonable jury to conclude that Defendants Borman, Rosario, and Swenson fabricated Nova's statements inculpating Hincapie.  Nova is purported to have told former parole commissioner Robert Dennison, decades later, that he did not recall whether or not Hincapie was involved in the Watkins incident.  Even if this out-of-court, secondhand, equivocal remark were admissible, it could not, without more, support an inference that the statements Nova made in 1990 concerning Hincapie were fabricated.  And the only affirmative evidence of fabrication accompanying this statement is even more hearsay: a vague allegation by Nova, through his attorney in 1990, that his statements (in general, without reference to Hincapie) were "coerced."  (Ex. 45 ¶ 7(k).)  This is insufficient for fabrication claims stemming from Nova's interview to survive summary judgment.

The evidence supporting Hincapie's claim that Detectives Christie, Rizzo, and Santoro fabricated Fernandez's statements is no less flimsy.  Here, Hincapie relies on the fact that the portion of Fernandez's handwritten statement identifying the people who were "short" on admission money for Roseland only included the name "Johnny" in the margin between lines of

---

[24] As discussed *supra* note 4, to avoid the risk of an unjust result premised on a clerical technicality, the Court—for the present—relies upon Carpentier's unsigned affidavit, and exercises its discretion under Rule 56(e)(1) to allow Hincapie 60 days to cure the deficiency.  However, should Hincapie fail to submit a valid affidavit or show cause why the unsigned affidavit should be considered, the Court will grant Defendants' motion for summary judgment on the fabrication claims stemming from the Carpentier interview.  The evidence underlying these claims is insufficient to survive summary judgment absent Carpentier's assertions in the putative affidavit.

text.  (Ex. Q at ECF pagination 3.)  "[I]n the context of the broader summary judgment record," Hincapie contends, this detail "is circumstantial evidence of defendants' effort to manufacture a criminal case" against him.  (Pl.'s Rule 56.1 Stmt. ¶ 92, ECF No. 190.)  But importantly, unlike for the Hincapie and Carpentier interviews, the record is bereft of any affirmative evidence that Fernandez endured abusive, coercive, or otherwise problematic treatment during his interview. Thus, even if Hincapie's "margin" theory were not undermined just a few lines later—where Fernandez's statement again lists "Johnny" (*not* in the margins this time) as part of the group that "went down to the platform to look for someone to rob"—there would be insufficient evidence for a reasonable jury to conclude the earlier statements were fabricated.  (Ex. Q at ECF pagination 3.)

Finally, there is no evidence whatsoever that directly implicates Defendants Ali, Rosario, or Connolly[25] in any alleged fabrication.

The Court therefore grants the motion for summary judgment as to Hincapie's fabrication claims against Defendants Ali, Borman, Connolly, Rizzo, Rosario, Santoro, and Swenson.

 ii. *Brady Claims*

Similarly, Hincapie's fair trial claims stemming from purported *Brady* violations must also be dismissed at this stage.  To prevail on a denial of a fair trial claim based on a *Brady* violation, "a plaintiff must demonstrate that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State; and (3) prejudice ensued."  *McCaffrey v. City of New York*, No. 11-cv-1636 (RJS), 2013 WL 494025, at *11 (S.D.N.Y. Feb. 7, 2013) (cleaned up).

Hincapie's *Brady* claims center on Lopez's videotaped statements to ADA Henken that Hincapie left the group before the Watkins incident.  Hincapie does not dispute that these

---

[25] Sergeant Connolly's surname has been spelled both "Connelly" and "Connolly" in this action.

statements were disclosed prior to trial.  He therefore, of course, cannot show that these specific statements were suppressed, let alone that he was prejudiced.

Nonetheless, he argues, even if these specific statements were not suppressed, they suggest the existence of other undisclosed exculpatory statements.  He insists that Lopez's exculpatory videotaped statements "confirm[]" that he must have said the same thing to Detectives Casey and Swenson earlier in the day.  (Pl.'s Rule 56.1 Stmt. ¶ 59.)  Therefore, Hincapie contends, the absence of exculpatory statements from the police summary of the earlier interview—and indeed the reference therein to "Johnny" as one of the people who "lagged behind" (Ex. K)—raises a question of fact as to whether the detectives suppressed additional exculpatory material.

But this sort of "unsubstantiated speculation is not enough to create a factual dispute to overcome summary judgment." *Abreu v. Romero*, No. 08-cv-10129 (LAP), 2010 WL 4615879, at *5 (S.D.N.Y. Nov. 9, 2010).[26]  Hincapie has presented no affirmative evidence that Lopez, in fact, made any exculpatory statements in his first interview.  And the mere fact that his statements differed at times in their level of detail would not permit a reasonable jury to conclude that additional exculpatory statements existed, let alone that any were suppressed, or that Hincapie— to whom the exculpatory videotaped statements were disclosed—was somehow prejudiced.[27]

The Court therefore grants Defendants' motion for summary judgment as to Hincapie's fair trial claims stemming from alleged *Brady* violations.

---

[26] *Aff'd*, 466 F. App'x 24 (2d Cir. 2012).

[27] Likewise, to the extent Hincapie persists in his claim that exculpatory information concerning Anthony Nichols was purportedly withheld (*see* Compl. ¶ 199), that claim must be dismissed at this stage.  Although the summary judgment record includes discussion of Nichols' imperfect eyesight, there is no evidence that this information was known to, or suppressed by, prosecutors. (*See e.g.*, Ex. 4d, ECF No. 191-4d; Nichols Dep. at 61, 92–83, 111, 227, ECF No. 191-7; Ex. 24, ECF No. 191-24.)  Nor has any evidence been presented to the Court substantiating the other allegations in the Complaint regarding Nichols.  (*See* Compl. ¶¶ 153–155.)

###### d.     Malicious Prosecution

Factual disputes, however, preclude summary judgment on Hincapie's malicious prosecution claims against several Defendants.

To prevail on a § 1983 claim for malicious prosecution, a plaintiff must show "a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010).  Under New York law, the requisite elements are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Baker v. City of New York*, 551 F. Supp. 3d 258, 269 (S.D.N.Y. 2021) (internal quotation marks omitted).  Defendants do not contest the second[28] or fourth[29] factors.

***Initiation of Proceedings.***     Instead, they first contend there is no evidence that any Defendants "initiated the proceedings" against Hincapie.  But, at least with respect to Detectives Casey, Christie, and Gonzalez, Defendants rely on an overly restrictive view of what conduct may satisfy this requirement.  "A jury may permissibly find that a defendant initiated a prosecution where he . . . prepared an alleged false confession and forwarded it to prosecutors." *Manganiello*, 612 F.3d at 163 (cleaned up).  As the Court has already discussed, there is sufficient evidence for

---

[28] The Court has already held as a matter of law that the vacatur of Hincapie's convictions—which Defendants do not dispute occurred—satisfies this factor, even though the vacating court found that Hincapie had not established actual innocence. *Hincapie*, 434 F. Supp. 3d at 71.  The Supreme Court has subsequently reinforced this conclusion. *See Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022) ("[A] Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence.  A plaintiff need only show that the criminal prosecution ended without a conviction.").

[29] A reasonable jury could conclude that Detectives Casey, Christie, and Gonzalez acted with actual malice. "[A] lack of probable cause generally creates an inference of malice." *Days v. Eastchester Police Dep't*, No. 18-cv-11538 (NSR), 2020 WL 5504433, at *8 (S.D.N.Y. Sept. 9, 2020) ("Malice might be inferred from . . . [detective's] actions during Plaintiff's interrogation.").

a jury to conclude that Detectives Casey, Christie, and Gonzalez collaborated to coerce a fabricated confession from Hincapie.  ADA Henken has, in turn, testified that she was briefed by (unnamed, plural) "detectives" concerning their interview with Hincapie.[30]  (Henken Dep. at 45.)  There is therefore sufficient evidence for a reasonable jury to conclude that actions taken by Detectives Casey, Christie, and Gonzalez satisfy the "initiation" requirement.

However, the Court agrees that there is no evidence that any other Defendants—including Ali, Borman, Connolly, Rizzo, Rosario, Santoro, and Swenson—satisfy this requirement.

***Probable Cause.***  Defendants also argue that, irrespective of any alleged wrongdoing, independent probable cause existed to prosecute Hincapie.  But although the grand jury's decision to indict Hincapie "gives rise to a presumption that probable cause exists," this presumption "may be rebutted by evidence of various wrongful acts on the part of police."  *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006).  For example, where a suspect's statements were "coerced and the prosecution was initiated based on a confession fabricated by Defendants, the factfinder could conclude that no reasonable officer would believe that there was probable cause to prosecute." *Tankleff v. Cty. of Suffolk*, No. 09-cv-1207 (JS) (AYS), 2017 WL 2729084, at *21 (E.D.N.Y. June 23, 2017); *Gonzalez v. Hahl*, 850 F. App'x 127, 128 (2d Cir. 2021) ("[W]here there is factual dispute about the events giving rise to probable cause, the case should proceed to a jury.") (summary order) (citing *Boyd v. City of New York*, 336 F.3d 72, 77–78 (2d Cir. 2003)).

Here, both Hincapie's confession and Carpentier's statements implicating Hincapie were part of the mix of information available to ADA Henken when she was deciding which suspects to charge.  As the Court has already discussed, there is sufficient evidence for a reasonable jury to conclude that both of these threads of evidence were fabricated.  Were a jury to do so, it could also

---

[30] ADA Henken is not named as a defendant in this case.

reasonably conclude that there was not probable cause to prosecute Hincapie—that between Lopez's exculpatory statements, the lack of a confession from Hincapie, and the general confusion and discord between the victims' accounts concerning who precisely was present for the robbery, there was not "reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense ha[d] been committed" by Hincapie.  *Gonzalez*, 850 F. App'x at 128 (quoting *Boyd*, 336 F.3d at 75–76); *see Niemann v. Whalen*, 911 F. Supp. 656, 667–68 (S.D.N.Y. 1996) (declining, despite the presence of some other evidence tending to inculpate the defendant, to "determine on summary judgment" whether probable cause existed because "genuine questions of fact exist regarding whether the [defendant's] confession was coerced").

The Court therefore denies the motion for summary judgment as to Hincapie's malicious prosecution claims against Detectives Casey, Christie, and Gonzalez.  The motion is granted only with respect to Defendants Ali, Borman, Connolly, Rizzo, Rosario, Santoro, and Swenson.

**e.      Failure to Intervene**

The Court reaches a similar conclusion concerning Hincapie's failure to intervene claims. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Baker*, 551 F. Supp. 3d at 267 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  To prevail on a failure to intervene claim, a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene."  *Baker*, 551 F. Supp. 3d at 267 (internal quotation marks omitted).  Although law enforcement officers may not ultimately "be held liable for failure to intervene where they are liable under a direct theory of participation," a plaintiff may

proceed past the summary judgment stage pursuing both theories of liability in the alternative. *See Rizk v. City of New York*, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020).

As the Court has already discussed, there is sufficient evidence that Detectives Casey, Christie, and Gonzalez were present when Hincapie's constitutional rights were being violated. Whether any had a realistic opportunity to intervene is "a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Sloley v. VanBramer*, 945 F.3d 30, 47 (2d Cir. 2019) (internal quotation marks omitted). The Court finds that, given the length of the interviews in question and the factual disputes concerning each individual detective's involvement, a reasonable jury could conclude that each detective neglected his duty to intervene.

Summary judgment is therefore denied as to Hincapie's failure to intervene claims against Detectives Casey, Christie, and Gonzalez. However, because there is no evidence that any other Defendant had a realistic opportunity to prevent Hincapie's rights from being violated, summary judgment is granted with respect to the failure to intervene claims against all other Defendants.

### f.   Supervisory Liability

Summary judgment must also be granted with respect to all of Hincapie's supervisory liability claims. The record contains no evidence whatsoever that any of the supervisory Defendants either (1) "participated directly in the alleged constitutional violation,"[31] (2) "after being informed of the violation through a report or appeal, failed to remedy the wrong," (3) "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," (4) "w[ere] grossly negligent in supervising subordinates

---

[31] The only supervisor Defendant the record even arguably implicates through direct involvement is Sergeant Borman, who participated in the Nova interview. The Court, however, has already dismissed *supra* Hincapie's fabrication claims stemming from this interview; there is therefore no surviving underlying claim to which supervisory liability for Sergeant Borman could attach.

who committed wrongful acts," or (5) "exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (internal quotation marks omitted).

### g.    Intentional/Negligent Infliction of Emotional Distress

Finally, Hincapie's emotional distress claims also fail in their entirety because they are subsumed by his other claims.  "Federal courts in the Second Circuit agree" that emotional distress claims must be dismissed "where the conduct underlying the claim falls within the ambit of traditional tort liability."  *Garcia v. Cty. of Westchester*, No. 11-cv-7258 (KMK), 2017 WL 6375791, at *30 (S.D.N.Y. Dec. 12, 2017) (internal quotation marks omitted) (intentional infliction of emotional distress claim); *see Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 364 (S.D.N.Y. 2021) (negligent infliction of emotional distress claim); *see also Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) ("The New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available."). This rule derives from the "roots" of the emotional distress torts: "the acknowledgment by the courts of the need to provide relief in those circumstances where traditional theories of recovery do not."  *Uber Techs*, 551 F. Supp. 3d at 364 (internal quotation marks omitted).

Hincapie attributes his emotional distress to his coerced confession and the other allegedly fabricated evidence.  (*See* Pls.' Oppo. at 25, ECF No. 189.)  Because this same conduct underlies Hincapie's other surviving grounds for relief, the emotional distress claims must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.

Specifically, summary judgment as to Hincapie's coercion claims is denied with respect to

Detectives Christie and Gonzalez, but granted with respect to Sergeant Ali and any "unidentified defendants" referenced in the Complaint. The Court does not today address the coercion claim against Detective Casey, which is not contested at this stage and may therefore proceed to trial.

Summary judgment as to Hincapie's fair trial claims based on fabrication of evidence is denied with respect to Detectives Casey, Christie, and Gonzalez, but granted with respect to all other defendants. Summary judgment is also granted as to all fair trial claims based on alleged *Brady* violations.

Summary judgment as to Hincapie's malicious prosecution claims is denied with respect to Detectives Casey, Christie, and Gonzalez, but granted with respect to all other Defendants.

Summary judgment as to Hincapie's failure to intervene claims is denied with respect to Detectives Casey, Christie, and Gonzalez, but granted with respect to all other Defendants.

Finally, summary judgment is granted as to Hincapie's supervisory liability and emotional distress claims in their entirety.

Hincapie is directed, within 60 days, to submit to the Court a signed and sworn copy of the Carpentier Affidavit, or to show cause why the unsigned affidavit should be considered. Should Hincapie fail to do so, summary judgment will be granted as to the fabrication of evidence claims stemming from Detectives Casey and Detective Gonzalez's interview of Carpentier.

Dated: New York, New York
     July 21, 2022

SO ORDERED

_____

**HONORABLE PAUL A. CROTTY**
United States District Judge