1. I am making the following affidavit to disclose in detail what actually occurred throughout my arrest and interrogation by Detective Donald Casey and Detective Carlos Gonzalez on the early morning of September 3, 1990. I did not attempt to make this affidavit until now because I assumed that I could not recant any of the statements contained in either the written or videotaped "confessions" and that any subsequent statements like the foregoing would not have any legal value or effect regarding myself or any one else involved in this case.
2. In July of 2013, I was contacted by a legal representative for Johnny Hincapie inquiring about my willingness to outline my account of what occurred during my interrogation by Detectives Casey and Gonzalez, in particular their behavior in questioning me. Although I was initially reluctant, I am now willing to disclose that some of my statements in the written and video taped "confessions" were only repetitions of what I learned from Detectives Casey and Gonzalez in which I otherwise did not know, and that some of my statements were made falsely due to my fear of being pinned for murder if I did not admit to more than actually happened. I felt very intimidated by their threatening manner in which they goaded me to confirm their suppositions regarding what happened. In a few instances, I did not deny something they inquired about because I did not want to jeopardize my chance of getting out. The following is based on what I clearly recall as the actual facts of these events.
3. My first contact with the police began around 4:30 AM that day with Det. Rosario on the sidewalk across the street from Roseland Ballroom. At that time, a co-fedendant, Ricardo Nova, was among a few men that were facing the wall, being searched by police. Det. Rosario then flagged me to come to him. He asked me if I had any identification to which I replied no. He then said that I would have to come with him to the police precinct in order to verify who I was. His demeanor was such that I did not believe that I could refuse. Ricardo Nova and I were put in the back seat of an unmarked car and driven to the precinct.
4. At the precinct, I was made to sit and wait until an officer came speak to me. Nova was escorted to another area. About twenty minutes later, Det. Casey approached, ordered me to

stand, handcuffed me, and escorted me to another room. He would not tell me why I was under arrest. The room was empty except for a table and chairs. When Det. Gonzalez entered, they closed the door. At this point I was filled with fear and anxiety, although I had no idea what I was being accused of and had no idea that anyone had died.

5. Casey and Gonzalez said they were investigating a murder and wanted to know what I knew about it. When I replied that I knew nothing about any murder, they insisted that they already knew what happened and that others had already told them of my involvement. They said that if I cooperated, I had their word that I would get off and that they would even drive me home. However, if I didn't, I'd be the one facing blame for murder. Since I had no idea or reason to believe that someone had died, I kept saying that I had no idea what they were talking about.

6. One of them said more than once, "We'll be here all day till you tell us what happened… you don't want to go down for murder, do you?" (paraphrasing). Whenever I told them that I did not know anything, Casey would angrily mock me and threaten to have me go down for the whole rap.

7. As we proceeded, Gonzalez asked me to confirm whether certain people were there, including Rocstar, Johnny, Ricardo, and Emilio. I assumed that they already had this information and needed corroboration. Hence, I responded "Yeah" or "I think so" each time he mentioned a name, despite my not being entirely sure.

8. I particularly recall seeing Johnny at the upstairs level after arriving to the subway station. He was by a bench with a girl whose twin sister had chatted with me during the train ride. However, confirming his name despite being completely uncertain did not matter at that time because I thought it would help me avoid being charged for murder.

9. They asked me to tell them how the robbery occurred. I replied that it all went so fast that I wasn't sure and that as a lookout, I could not see the incident from where I was standing (midway of the staircase ).

10. I was asked if I was carrying a knife or box-cutter. I said no. They reminded me very sternly that people already spoke to them so I'd better get this right. Despite sensing the threat behind that warning, I took a chance and insisted that I didn't. I was surprised that they did not challenge my answer. Instead, one of them asked me about Rocstar (Gary Yull Morales) and whether he had a knife?" I replied that I didn't know. They contended that I must have known or seen someone with a knife. The other one then stated, "Well, we were told that he had a butterfly knife. Is that right?" (paraphrasing). I replied, "I guess so" or "I think so," hoping to alleviate the tension.

11. At another point, they asked me whether I had knocked down a lady that was there. I replied no. Casey became aggravated and remarked, "You didn't ~~you~~ grab or hit anybody? That's not what we were told." (paraphrasing). I wanted to say absolutely not but was afraid that he might become more upset and pin me with the murder charge. Hence, I told him that I only held off a woman who came to me yelling for help, However, this was entirely untrue. I said it only to keep Casey and Gonzalez. from being irritated. If one were to check the trial record and the investigation records, they would not find anything that corroborates this false point about any woman coming to me screaming or that I held her off.

12. Next, I was told that I needed to write what I told them on paper. I was not sure how or where to start. Gonzalez told me to put down my name, date of birth, and to write that I am making the following statement. I waited for them to guide me through each point for which they posed a question like, "So you got to the subway with six other guys, right?" after I nodded or replied, "Yeah," Gonzalez or Casey would say, "Okay. Write that down." I complied with the impression that I was simply helping them to help me get around a possible murder charge.

13. Near the end of the written statement, I was asked about the last thing I saw before leaving the subway station. I stated that Emilio was the last person to leave although this was simply

the first thing I could think to say, hoping that it would suffice what they needed in writing. However, I had no certainty as to who was last to leave and was only guessing.

14. When I was told to sign the Miranda Rights form, I complied in order to appear cooperative and to curry favor with the detectives. I had no sense of the actual purpose or consequence of the form and was not given a chance to actually read it.

15. The detectives also told me that they were getting an attorney who would help me get out of this situation. I assumed that this person was like a counselor that would help me avoid being charged with murder.

16. During the videotaped questioning, I soon realized that this attorney was not so friendly. After she (ADA Donna Henkin) asked me about whether the detectives gave my Miranda rights before writing the statement, I replied "No, after writing the statement." My reply that the Miranda warnings were not read to me until after writing the statement was only to give her the correct order of events. However, I had no sense of the legal importance and requirement that the Miranda rights precede any incriminating statements.

17. At other points during the video questioning, ADA Henkin asked me to confirm some of the statements made earlier to the detectives. Although I wanted to retract them to set the record straight, I felt intimidated by Casey's presence in the room during the questioning. Hence, I did not completely deny the point that I joined the planning of the robbery, or the point that I saw Rocstar with a butterfly knife, or the point that I held off a lady who ran to me for help, although all these points were false.

Pursuant to U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on July 26, 2022.

P. Charpentier
PASCAL CHARPENTIER

Sworn to me on this 26th day of July, 2022

Notary Public

Baree N. Fett, Notary Public
Qualified in Kings County
Commission Expires May 7, 2024
Registration No. 02FE6260780

This remote notarial act involved the use of communication technology.